**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Jaime SOTO, also known as Leonel Guerra, Defendant–Appellant.**

**No. 91–4213.**

United States Court of Appeals, Tenth Circuit.

March 22, 1993.

Steven B. Muslin (Ira A. Moltz, with him on the brief), Chicago, IL, for defendant-appellant.

Richard D. McKelvie, Asst. U.S. Atty. (David J. Jordan, U.S. Atty., with him on the brief), Salt Lake City, UT, for plaintiff-appellee.

Before LOGAN, BARRETT and SEYMOUR, Circuit Judges.

LOGAN, Circuit Judge.

Defendant Jaime Soto appeals his conviction under 21 U.S.C. § 841(a)(1) for possession of a controlled substance with intent to distribute. Most issues on appeal arise out of the denial of defendant's motion to suppress cocaine found in a search of the automobile defendant was driving after he was stopped for a traffic violation. They raise nearly every difficult problem of standing, right to question, consent, and search possible in an automobile stop and search context. Defendant also contends that the prosecution made an improper appeal to ethnicity during closing argument.

I

Defendant was driving eastbound on Interstate 70 in Utah on a cold December day, when he was stopped by Sevier County Deputy Sheriff Phil Barney for traveling seventy-five miles per hour in a sixty-five mile zone. Barney asked defendant for his license and registration. Defendant produced an Illinois driver's license bearing the name Leonel Guerra and an identification card. Barney testified at a suppression hearing that defendant's hands were visibly shaking and that his movements were very fast, described by Barney as "panicky." Barney asked defendant for the car registration, which when produced showed the owner to be a person whose last name was Corral. Defendant identified the owner as his uncle, who had lent him the car for a trip from Chicago to Los Angeles and back. When Barney asked defendant for his uncle's address, defendant did not answer. Barney testified that defendant seemed to begin to answer the question "three or four times," but never actually did. Tr. of Motion to Suppress at 12.

The officer testified that he was concerned that defendant did not know his uncle's address, and that defendant appeared overly nervous. Still in possession of defendant's license and registration, Barney asked defendant whether he was carrying any firearms or narcotics in the car. Defendant replied that he was not. The officer then told defendant that he was going to issue a written warning for speeding, and proceeded back to his car where he performed an NCIC check on defendant's car. This check came back negative, and a check on the Guerra license revealed no outstanding warrants. Returning to defendant's car, Barney testified that he began to hand defendant the citation and documentation when he again noticed defendant's hand visibly shaking. At that point, without returning the license and registration, the officer once again asked whether defendant was carrying any narcotics or weapons. Barney testified that when he asked this question, defendant's hand "froze," and that defendant again responded in the negative. The officer then asked

permission to look in the car trunk. Defendant agreed, and got out of the car to open the trunk.

Officer Barney noticed that the matting covering the bottom of the trunk was in "disarray," and that the spare tire was out of place, leaning against the back of the back seat. There was only one handbag in the trunk, and no luggage evident in the passenger compartment. The officer pulled on the matting, and it came up "easily," revealing "what looked like fresh glue that was not set." Tr. of Motion to Suppress at 16. The area under the matting appeared to have been freshly painted, and the officer noticed "a seal of about two inches wide that appeared to run completely across the trunk from side to side about a quarter of the way up on the hump above the gas tank." *Id.* at 17.

The officer then asked permission to examine the passenger compartment, which defendant granted. When defendant told the officer that his car heater was not working, Barney had defendant and his two passengers, a woman and a young child, go to the officer's car to keep warm. At the time, 7:20 a.m. December 3, the outside temperature was eight degrees above zero.

Examining the rear seat, Officer Barney found that it was loose, and that the back of the car smelled of fresh paint. He pulled up the seat, and noticed that the area under the seat was completely clean, even though the car was a 1984 model. He found that the hook that holds the seat in place had been bent out of shape and was not securing the seat properly. Barney also noticed that the covering over the gas tank area was higher than normal. Taking these observations into account, the officer testified that he was confident that a secret compartment would be found in the vehicle, and that it most likely would contain narcotics, weapons, or large sums of money. Given the cold weather and poor lighting conditions, Barney asked defendant to follow him to a nearby service station where the inspection could continue. Defendant agreed, stating that he might be able to fix his heater at the same time.

Defendant followed the officer approximately two miles to a service station, where defendant's car was placed on a hoist. In the following inspection Barney noticed that the metal bracings securing the gas tank had been moved from their original positions, and that one area of the undercarriage appeared to be darker than the others. Examining that section, he discovered a door, secured by four carriage bolts, which he removed. He then saw three packages behind the door, which he suspected contained cocaine. The officer then arrested defendant, resecured the compartment door, and transported defendant to the sheriff's station. On the way, defendant stated that his real name was Jaime Soto, not Guerra, and that he was an illegal alien. Further inspection of defendant's car resulted in discovery of nineteen kilograms of cocaine.

After a jury trial, defendant was convicted of possession of a controlled substance with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), and sentenced to 121 months imprisonment. This appeal followed.

## II

A district court's denial of a motion to suppress evidence is reviewed under a clearly erroneous standard, and the evidence is considered in the light most favorable to the district court's ruling. *United States v. Horn,* 970 F.2d 728, 730 (10th Cir.1992); *United States v. Evans,* 937 F.2d 1534, 1536 (10th Cir.1991). The ultimate determination of reasonableness under the Fourth Amendment, however, as well as other conclusions of law, is reviewed de novo. *Horn,* 970 F.2d at 730; *United States v. Walker,* 933 F.2d 812, 815 (10th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 1168, 117 L.Ed.2d 414 (1992). If the district court's factual findings are based on an erroneous interpretation of law, a remand is appropriate unless the record is such that only one resolution of the factual issue is possible. *United States v. Price,* 925 F.2d 1268, 1270 (10th Cir.1991).

## A

The district court held that defendant had standing to challenge the search of the passenger compartment and trunk of the vehicle, but that he had no standing to contest the search of the secret compartment within the vehicle. When, as here, there is no dispute concerning the relevant facts, we review the district court's ruling de novo. *United States v. Rascon*, 922 F.2d 584, 586 (10th Cir.1990), *cert. denied*, — U.S. ——, 111 S.Ct. 2037, 114 L.Ed.2d 121 (1991); *United States v. Rubio–Rivera*, 917 F.2d 1271, 1274 (10th Cir. 1990).

In *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), the Supreme Court held that the proper approach to standing in Fourth Amendment cases "forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing." *Id.* at 139, 99 S.Ct. at 428. Fourth Amendment rights are personal, and cannot be asserted vicariously. *Rascon*, 922 F.2d at 586. Consequently, "a threshold issue in deciding a motion to suppress evidence is whether the search at issue violated the rights of the particular defendant who seeks to exclude the evidence." *Id.* This inquiry has evolved into a two-part test: The court must determine whether the defendant has exhibited a subjective expectation of privacy in the area searched, and also whether society is willing to recognize that expectation as being objectively reasonable. *Id.; accord United States v. Langston*, 970 F.2d 692, 698 (10th Cir.), *cert. denied*, — U.S. ——, 113 S.Ct. 439, 121 L.Ed.2d 358 (1992); *United States v. Arango*, 912 F.2d 441, 445 (10th Cir.1990), *cert. denied*, — U.S. ——, 111 S.Ct. 1318, 113 L.Ed.2d 251 (1991).

Whether a driver's privacy interest in an automobile is reasonable depends on the driver's lawful possession of the vehicle. "Where the defendant offers sufficient evidence indicating that he has permission of the owner to use the vehicle, the defendant plainly has a reasonable expecta-tion of privacy in the vehicle and standing to challenge the search of the vehicle." *Rubio–Rivera*, 917 F.2d at 1275. The government, citing *Arango* and *United States v. Erwin*, 875 F.2d 268 (10th Cir.1989), argues that defendant has no standing to challenge the search of his vehicle because he did not prove ownership of the car at the time of the search and did not show that he was in lawful possession of the vehicle.

In *Arango*, the defendant testified that he obtained the truck that was searched from a person he knew not to be the owner, and failed to present evidence regarding that person's lawful possession of the truck. 912 F.2d at 445–46. Although the court stated that the defendant "need not always come forward with legal documentation establishing that he lawfully possessed the area searched, [he] must at least state that he gained possession from the owner or someone with the authority to grant possession." *Id.* at 445 (citation omitted). Because the defendant "failed to introduce evidence that his possession of the truck was lawful," *id.*, he was held not to have standing to challenge the search. In *Erwin*, the defendant also failed to produce "evidence concerning where or from whom defendant obtained the vehicle or whether his apparent possession was lawful." 875 F.2d at 271. The court held that the defendant's mere possession of the rear door key was insufficient to establish an objectively reasonable expectation of privacy in the vehicle. *Id.*

We have also considered automobile-related standing in two other recent cases. In *Rubio–Rivera*, the defendant testified that the owner of the car had loaned it to him, and that the owner had "directed him to papers in the glove box indicating ownership." 917 F.2d at 1275. We held that this evidence was sufficient to confer standing on the driver to challenge a subsequent search. In *Rascon*, the defendant's statement that a friend had loaned him the car was insufficient by itself to confer standing, because the defendant introduced no evidence regarding his friend's lawful possession of the car before the loan. Analo-

gizing to *Arango*, the court held that the defendant had "failed to 'at least state that he gained possession from the owner or someone with the authority to grant possession.'" 922 F.2d at 587 (quoting *Arango*, 912 F.2d at 445).

The proponent of a motion to suppress bears the burden of demonstrating his standing to challenge the search. Although defendant did not testify at the suppression hearing, the record indicates that when questioned by Officer Barney, defendant asserted that the car was owned by his uncle, Mr. Corral, who had loaned him the car. The registration produced by defendant bore Corral's name, and a computer check on the vehicle revealed that it had not been reported stolen. Thus, unlike in *Arango* and *Rascon* but like in *Rubio–Rivera*, defendant here claimed to have borrowed the car from the rightful owner, and produced a registration bearing that individual's name. Although this evidence is not determinative of defendant's right to possess the vehicle, absent evidence that defendant wrongfully possessed the vehicle it is sufficient to confer standing on him to challenge the subsequent search of the car.

**B**

■ The district court held that defendant had no standing to challenge the search of the secret compartment beneath the car in which the cocaine was found, relying on *United States v. Ospina*, 682 F.Supp. 1182 (D.Utah 1988). *Ospina* itself relied almost exclusively on the Eleventh Circuit case of *United States v. Lopez*, 761 F.2d 632 (11th Cir.1985). In *Lopez*, Coast Guard officers boarded a vessel to make a document and safety sweep, and became suspicious when they "noticed approximately three feet of unaccounted-for space between the ice hold and the engine room." *Id.* at 634. Further inspection revealed a number of bales of marijuana in a secret compartment. The court denied the defendants standing to challenge the search, stating

> A secret compartment constructed within the confines of the hull of the ship is totally unlike a personal dufflebag or footlocker in terms of the uses to which it may be put, and the expectations of exclusive control to which it gives rise. We cannot imagine that society would recognize a reasonable expectation of privacy in the use of "dead space" in the hull of a ship, sealed with permanent fiberglass and painted to match the surrounding surfaces, for the legitimate storage of personal items.

*Id.* at 636. The same panel reached the same conclusion in the contemporaneous case of *United States v. Sarda–Villa*, 760 F.2d 1232 (11th Cir.1985). For several reasons, we hold that the authority of those two cases should not be extended to automobiles.

First, the privacy interests aboard ship are very different from those applicable to automobiles. The right to exclude others, normally a consideration in determining the reasonability of an expectation of privacy, is less significant at sea, because the Coast Guard enjoys the right to board a ship "without permission to conduct a safety and document search and gain access to all common areas of a boat." *Lopez*, 761 F.2d at 635. Thus, there is no reasonable expectation of privacy in cargo holds, ice holds, or engine rooms, although private spaces such as dufflebags and footlockers are protected. *Id.* The *Lopez* court recognized the limited nature of the expectation of privacy at sea, and did not extend its analysis to all situations in which a secret compartment might be present.

Second, the Eleventh Circuit itself has limited the scope of *Lopez* and *Sarda–Villa*. In *United States v. Massell*, 823 F.2d 1503 (11th Cir.1987), it held that the defendant had standing to challenge the search of a secret cavity, when he had demonstrated unrestricted custody and control of the vessel in which the compartment was found. The court stated emphatically that "[*Sarda–Villa*] does not stand for the proposition that there is never an expectation of privacy when a secret compartment is used." *Id.* at 1507.

Third, if society is willing to recognize as reasonable an expectation of privacy in an automobile in general, it cannot deny such

recognition to particular compartments within that vehicle. The fact that secret compartments are most often used to conceal narcotics, weapons, or large amounts of cash does not alter the analysis; such *post hoc* rationalization subverts the purpose of the Fourth Amendment protection against unreasonable searches. Although an automobile is not accorded the same level of privacy protection as a permanent dwelling, if it is to be protected at all, there appears no reason to treat searches of secret compartments within the vehicle on any different basis than searches of the glove compartment or trunk.

Because defendant presented evidence that he was in lawful possession of the car at the time of the stop, his expectation of privacy in the contents of the car was objectively reasonable. His claim that his uncle loaned him the car and that he was rightfully in possession manifested a subjective expectation of privacy in the contents of the car. Therefore, both the objective and subjective components of the standing inquiry have been met by defendant, and we hold that he has standing to challenge the search of the entire car, including the secret compartment.

### C

 A traffic stop is an investigative detention analogous to a *Terry* stop, in that, although probable cause is not required, the detaining officer must have an objectively reasonable articulable suspicion that a traffic violation has occurred or is occurring before stopping the automobile. *Horn*, 970 F.2d at 731. Here, Officer Barney obtained a radar reading on defendant's car of seventy-five miles per hour in a sixty-five miles per hour zone, and confirmed that reading by pacing defendant for a short distance. Thus, the stop and detention for speeding was clearly supported by a reasonable suspicion that a violation had occurred, and defendant does not argue otherwise.

Nor is there any evidence that the traffic stop was a pretext to investigate an unrelated crime for which no reasonable suspicion existed. Here, as in *Horn*, no argument has been made that the initial stop was for any reason other than the speeding violation. "Absent introduction of any rationale for the stop outside the parameters of the traffic violations, the stop cannot, by definition, be called 'pretextual.'" *Id.* The initial stop of defendant for a traffic violation was consistent with the requirements of the Fourth Amendment.

### D

 During a routine traffic stop, the detaining officer may request a driver's license and vehicle registration, run a computer check on the car and driver, and issue a citation. *Walker*, 933 F.2d at 816; *United States v. Pena*, 920 F.2d 1509, 1514 (10th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2802, 115 L.Ed.2d 975 (1991); *United States v. Guzman*, 864 F.2d 1512, 1519 (10th Cir.1988). "If the driver produces a valid license and proof of right to operate the vehicle, the officer must allow him to continue on his way without delay for further questioning." *Pena*, 920 F.2d at 1514. If the officer wishes to detain the driver for further questioning unrelated to the initial stop, the officer must have an objectively reasonable articulable suspicion that illegal activity has occurred or is occurring. *Id.*

 In this case, Officer Barney testified that defendant appeared "panicky" and was unable to provide even a general address for his alleged uncle, from whom he claimed to have borrowed the car. Based on these two factors, Barney then inquired as to whether defendant had any firearms or narcotics in the car. The district court made no finding as to whether this evidence was sufficient to support a reasonable suspicion of illegal conduct at that time.[1] However, because the relevant facts are undisputed, we need not remand for further findings and may determine as

---

1. The district court found that Officer Barney had reasonable suspicion to seek defendant's consent to search the car, but this was only after the officer had twice asked defendant whether he had weapons or narcotics in the car.

a matter of law whether the facts as found justified the continued detention and questioning by the officer.

When Barney questioned defendant about matters unrelated to the initial traffic stop, the detention entered a new phase. Barney still retained defendant's license and registration at that point, so defendant was not free to leave. Thus, any questions asked were not part of a consensual encounter between officer and citizen, but were elements of an investigative detention. *Walker,* 933 F.2d at 817. Whether such an investigative detention is supported by an objectively reasonable suspicion of illegal activity does not depend upon any one factor, but on the totality of the circumstances. *United States v. Sokolow,* 490 U.S. 1, 8, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989); *United States v. Ward,* 961 F.2d 1526, 1529 (10th Cir.1992).

In other cases, we have found reasonable suspicion to be present in a variety of circumstances. In *Horn,* we held that when the driver proffered an unnotarized bill of sale for the vehicle, written on the back of an envelope, and title to the car in a different person's name, the officer then had a reasonable articulable suspicion "to support further questioning about drugs, money or weapons in the car." 970 F.2d at 732. *United States v. Turner,* 928 F.2d 956 (10th Cir.), *cert. denied,* ── U.S. ──, 112 S.Ct. 230, 116 L.Ed.2d 187 (1991), involved a driver who appeared nervous, who claimed to be an auto mechanic but had well-manicured hands and an expensive compact disc collection, and who was driving a car that was not registered to him or his passenger. Under these circumstances, this court held that the district court's finding of reasonable suspicion was "supported by the evidence," and "was sufficient to permit the single question about the presence of drugs or weapons in the car." *Id.*

at 959. In *Pena,* the NCIC computer was down, and the driver was unable to provide proof that he was entitled to operate the car. Further, the car's trunk lock had been punched out, the license plates on the car were from California whereas the driver was licensed in Illinois, and the driver gave incomplete and inconsistent information concerning the ownership of the vehicle and his destination. 920 F.2d at 1514. Given this evidence, we upheld the district court's finding that the extended detention following the initial stop was reasonable. In *Arango* we held that the driver's "inability to provide credible proof that he lawfully possessed the truck, combined with the inadequate amount of luggage in the truck for a two week vacation," provided sufficient grounds to support further inquiry into the transportation of contraband. 912 F.2d at 447. In *United States v. Corral,* 899 F.2d 991 (10th Cir.1990), we affirmed the district court's finding of reasonable suspicion based on a spare tire being out of place and the presence of a bulge in the spare tire well. *Id.* at 994. Finally, in *United States v. Rivera,* 867 F.2d 1261 (10th Cir.1989), we allowed an extended detention based on the car occupants' conflicting accounts of their travel plans and relationship to one another, coupled with the driver's inability to produce ownership papers for the vehicle. *Id.* at 1264.[2]

Defendant points to two other cases in which reasonable suspicion was held not to exist. In *Walker,* we refused to reverse a district court finding that the nervousness of the driver, evidenced by his shaking hands, alone "did not give rise to an objective reasonable suspicion." 933 F.2d at 817. In *Guzman* we held that evidence that a pregnant passenger looked sick, appeared apprehensive, was sweating considerably (in the middle of the desert), and did not look the officer in the eye did not

---

**2.** The dissent attempts to distinguish the cases we have relied on by emphasizing facts in them we do not mention. None of these facts seem critical. For example, in *Horn* we fail to see how "provocative" parking coupled with irregular ownership papers generates any more suspicion of criminal activity than nervousness combined with an inability to explain the right to possession of the vehicle. In *Turner* and *Corral*

despite the return of the defendants' documentation we conducted our suspicion analysis on the basis that the defendants were not free to leave the scene. In *Rivera,* although the officer detected a strong odor of air freshener, we cited only the conflicting responses and the inability of the driver to produce ownership papers as our basis for finding reasonable suspicion to continue questioning. *See* 867 F.2d at 1264.

generate any reasonable suspicion of illegal activity, given that the original stop was based on the driver's failure to wear his seat belt. 864 F.2d at 1520.[3]

We hold that, under the circumstances of this case, the officer's additional questioning was supported by reasonable suspicion. We recognize that in *Walker* and *Guzman* we stated the nervousness of either the driver or a passenger, by itself, was insufficient to generate a reasonable suspicion of illegal activity,[4] and we recognize that defendant's shaking here may have been caused at least in part by the extreme cold. Nevertheless, Officer Barney testified that defendant appeared nervous, not merely cold, and this testimony was credited by the district court. Further, defendant's nervousness was not the only factor relied upon by the detaining officer. Because defendant claimed to have borrowed the car from his uncle, it was reasonable for the officer to seek corroboration by asking defendant to provide an address for his uncle. Defendant's complete failure to respond, coupled with his nervous appearance, generated an objectively reasonable suspicion of illegal activity that would support further questioning by the officer.

The essential difference between the majority and the dissent on this issue is that the dissent appears to assume defendant established that the "Corral" whose name appeared on the car registration was in fact defendant's uncle, that defendant's failure to give Corral's address was likely the result of the combination of his nervousness and the cold temperature, and that no further questioning was justified. We have held that defendant's statement to the officer that Corral was his uncle and

that he had permission to drive gave him standing to challenge the search, in the absence of evidence that defendant did not have the car owner's permission. Nevertheless, uncertainty and suspicion of wrongdoing remained and, we hold, justified further questioning. The dissent also states that if there was sufficient suspicion to continue questioning the interrogation must be limited to ascertaining whether the car was stolen. No authority is cited for that proposition, and our cases are to the contrary. *See Horn*, 970 F.2d at 732; *Turner*, 928 F.2d at 959; and *Arango*, 912 F.2d at 447.

Based on the officer's experience, specific questioning relating to weapons and narcotics was reasonable, given that such items are often transported in personal automobiles over the interstate highway system. We therefore hold that the additional detention accompanying the officer's questioning regarding narcotics and weapons was supported by an objectively reasonable suspicion, and was consistent with the Fourth Amendment.

E

As Officer Barney was giving defendant a citation and returning his documents, again noticing defendant's nervousness, the officer repeated his earlier question concerning narcotics and weapons. At that point defendant's hand "froze," heightening the officer's suspicions, and motivating his request for consent to search defendant's trunk. Defendant agreed. Defendant now argues that this consent was not voluntary, and that any evidence obtained

---

**3.** Defendant calls our attention to two additional cases, but neither is helpful on this point. *United States v. Gonzalez,* 763 F.2d 1127 (10th Cir.1985), involved an interpretation of *Hayes v. Florida,* 470 U.S. 811, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985), regarding the level of suspicion required to permit officers to order a driver to follow them to a location away from the highway. We held that probable cause was required, and that it had not been shown in that case. In *United States v. Recalde,* 761 F.2d 1448 (10th Cir.1985), the arresting officers admitted that they had no evidence other than a "hunch" that the occupants of the car they had detained

were engaged in illegal activity. Such a situation provides little guidance for resolving the issue before us, in which the question centers on the amount of evidence required, not whether any at all must be presented.

**4.** Actually, in *Walker* we stated, "No doubt there are circumstances in which an individual's nervous behavior would give rise to a reasonable suspicion of criminal activity. We find only that the district court's determination that it did not do so here is not clearly erroneous." 933 F.2d at 817 n. 3.

as a result is irrevocably tainted and must be suppressed.

We cannot accept the government's argument that, because Barney was in the process of returning the documents to defendant when he asked for consent to search, the consent was the product of a consensual citizen-officer encounter, rather than an investigative detention. It is clear from the record that the officer never actually handed back defendant's license and registration, although he stated that he would not have detained defendant if defendant had taken them out of his hand.

■ If "a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual and no reasonable suspicion is required. The encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature." *Florida v. Bostick,* —— U.S. ——, ——, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991) (internal quotation omitted). In *United States v. Werking,* 915 F.2d 1404 (10th Cir.1990), we held that "[t]he initial investigative detention was concluded when [the officer] returned [the driver's] license and registration papers. At this point, the encounter between [the driver] and [the officer] became an ordinary consensual encounter between a private citizen and a law enforcement official." *Id.* at 1408; *see also Turner,* 928 F.2d at 958–59; *United States v. Deases,* 918 F.2d 118, 122 (10th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2859, 115 L.Ed.2d 1026 (1991). From these cases, a clear principle emerges: Unless the officer has returned the driver's documentation, the driver is not free to go, and the encounter is not consensual.[5] We therefore disagree with the magistrate judge's conclusion, adopted by the district court, that "[t]he law is not so metaphysical that a distinction must be made on the basis of the particular possession of the items being tendered." Report and Recommendation at 13. The law requires a driver to be in possession of a valid license and registration when operating a motor vehicle on public roads. As long as the driver does not have those items, he or she cannot legally drive away. Such a bright-line rule also facilitates proper compliance by law enforcement officers; if the officer knows that an encounter cannot be deemed consensual unless the driver's documents have been returned, there will be less confusion over whether further questions may be asked and what subjects they may cover. In this case, the officer retained possession of defendant's documents, so defendant was still being detained at the time consent was given. We must therefore determine whether that consent was voluntary and whether the subsequent search exceeded the scope of the consent.

■ The voluntariness of consent must be determined from the totality of the circumstances, and the government bears the burden of proof on the issue. *Price,* 925 F.2d at 1271. When making this determination, a court should not presume that the consent was either voluntary or involuntary. *Id.* The district court found that defendant's consent was voluntarily given, and we must accept that finding unless it is clearly erroneous. *United States v. Wright,* 932 F.2d 868, 878 (10th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 428, 116 L.Ed.2d 448 (1991). Under the approach approved in *Price,* the government must show that there was no duress or coercion, express or implied, that the consent was unequivocal and specific, and that it was freely and intelligently given. *Price,* 925 F.2d at 1270.

■ Valid consent may be given by a person being detained. *United States v. Ramirez–Jiminez,* 967 F.2d 1321, 1324 (9th Cir.1992) (detention at border checkpoint; defendant not threatened, screamed at, or struck, and no evidence of psychological coercion); *see also United States v. Jackson,* 901 F.2d 83, 84 (7th Cir.1990) (defendant appeared outside occupied house with hands in pockets; officers sought permission to search pockets, never displayed weapons); *United States v. Moreno,* 897 F.2d 26, 33 (2d Cir.) (defendant appre-

---

**5.** This does not mean that an officer-citizen encounter will necessarily be consensual just because the driver's license and registration have been returned. *See Turner,* 928 F.2d at 959.

hended in public area, not abused or threatened, no weapons displayed, consent requested after brief detention), *cert. denied*, 497 U.S. 1009, 110 S.Ct. 3250, 111 L.Ed.2d 760 (1990); *United States v. Garcia*, 866 F.2d 147, 152 (6th Cir.1989) (airport stop, two guards, no weapons displayed, no physical contact, no threatening· by guards); *United States v. Manuel*, 791 F.Supp. 265, 270 (D.Kan.1992) (detention made on public street, officers made clear their suspicion that defendant's package contained illegal drugs).

 Although the officer withheld defendant's license and registration, and we recognize that any individual being subjected to an investigative detention will feel some degree of compulsion to acquiesce to an officer's request, there is no evidence that any overt coercion was employed. It appears Barney did not unholster his weapon, did not use an insisting tone or manner, did not physically harass defendant, and no other officers were present. Further, the incident occurred on the shoulder of an interstate highway, in public view. Officer Barney sought permission specifically to . look in the trunk, and defendant got out of the car and opened the trunk himself. Defendant makes no contention that he misunderstood Barney's request; any such claim is precluded by defendant's act of opening the trunk. Thus, defendant's consent was unequivocal and specific. We therefore hold that the district court's finding that defendant's consent was voluntary under the circumstances was not clearly erroneous.

Nor did the officer's search exceed the scope of defendant's consent. "The scope of a search is generally defined by its expressed object." *Florida v. Jimeno*, — U.S. —, —, 111 S.Ct. 1801, 1804, 114 L.Ed.2d 297 (1991). Barney requested permission to examine the trunk, and looked only there. Based on his observations of the interior of the trunk, the officer then asked to search the passenger compartment, and confined his search to that area. At all times, the searches at the location of the stop conducted by Barney were within the scope of the consent given.

**F**

After his examination of the back seat area, Officer Barney was convinced that a secret compartment would be found in the vehicle, and that it most likely would contain narcotics, weapons, or large amounts of currency. Because conducting a search of the car's undercarriage at the scene would have been difficult, the officer asked defendant to follow him to a nearby service station where the inspection could continue. Defendant agreed, stating that he might be able to get his heater fixed at the same time. Because defendant was removed from the scene of the initial detention, we must determine if the removal was permissible under the proper standard, and, if not, whether defendant's consent to follow the officer to the service station was voluntary.

 The district court found that, following the searches of the trunk and passenger compartment, Officer Barney had probable cause to arrest defendant, given his conclusion that a secret compartment was present, and that the compartment likely contained contraband or cash. Absent exigent circumstances, once the detaining officer removes the detainee from the site of the initial stop, the line between investigative detention and custodial arrest has been crossed, and the transfer must have been supported by probable cause. *United States v. Gonzalez*, 763 F.2d 1127, 1132 (10th Cir.1985); *United States v. Recalde*, 761 F.2d 1448, 1456 (10th Cir.1985). The district court analogized the situation to that in *Arango*, in which the officers determined that the defendant's truck had a false bed, and that there was not enough luggage present to support the defendant's claim that he was on a two-week vacation. This court held that those factors generated probable cause to arrest the defendant, and therefore to compel him to follow the officers to the police station. 912 F.2d at 447. Given what the officer observed in his search of the trunk and passenger compartment at the scene of the stop, *see* part I *supra*, we cannot conclude that the district court's finding of probable cause to arrest at that point was clearly erroneous.

Therefore, regardless of whether defendant consented to the trip, it was consistent with the requirements of the Fourth Amendment.[6]

We therefore affirm the district court's denial of defendant's motion to suppress the evidence found as a result of the search.

### III

 Defendant argues that certain remarks made by the prosecution during its closing argument were inflammatory and prejudicial because they made an improper appeal to race and ethnicity. Defendant did not object to the statements at trial, so we will reverse only if the argument constituted plain error that affected substantial rights of defendant. Fed.R.Crim.P. 52(b); *United States v. Abello–Silva*, 948 F.2d 1168, 1182 (10th Cir.1991), *cert. denied,* — U.S. ——, 113 S.Ct. 107, 121 L.Ed.2d 65 (1992).

Defendant objects to the following section of the prosecutor's closing statement:

You heard testimony that tells you the defendant is an illegal alien and you should not infer from that fact, alone, that he has a predisposition to commit any other crime.

We also heard testimony from his aunt, something to the extent that when someone is in this country illegally they need to get these documents. They need to get a social security card so they can get a job. The simple fact of it is an individual who is in this country illegally cannot legally obtained [sic] employment which puts someone like Mr. Soto in a very difficult position. They either obtain legitimate employment unlawfully by representing that they had a Social Security card, that they are someone who they are not, or they are a citizen. Or the only other alternative they have is to engage in illegitimate employment. They have to commit crimes in order to

finance themselves in order to generate an income.

What we know about Mr. Soto is that we know he is a self employed gardener, someone who does yard work. He is in possession of five thousand dollars in cash. How much motivation is there for someone who is an illegal alien who is in this country who cannot lawfully work in the United States because he is not lawfully registered as being here, what is the motivation for someone like that to engage in this kind of activity in order to earn their income? The motivation is great.

Tr. of Oct. 1, 1991, at 47–48. Defendant relies on the holding in *United States v. Doe*, 903 F.2d 16, 28 (D.C.Cir.1990), to support his contention that the above argument was inflammatory and prejudicial. In *Doe*, the court found that a prosecutor's diatribe on the deleterious effects of an influx of Jamaican drug dealers into Washington, D.C. was not harmless beyond a reasonable doubt, given the weakness of the government's evidence.

It is beyond peradventure that "[t]he Constitution prohibits racially biased prosecutorial arguments." *McCleskey v. Kemp*, 481 U.S. 279, 309 n. 30, 107 S.Ct. 1756, 1777 n. 30, 95 L.Ed.2d 262 (1987). However, selected comments gleaned from the record cannot be examined in isolation. "[A]ppellate review of the prosecutor's comments during argument at trial must occur in the context of the entire record." *Abello–Silva*, 948 F.2d at 1182. In *Abello–Silva*, we acknowledged that racially inflammatory prosecutorial arguments might infect the jury's deliberations, but that statements alluding to the defendant's ethnicity were not per se objectionable if supported by testimony and evidence in the record. *Id.* We held that there was "abundant" evidence against the defendant, and that the prose-

---

6. The situation is thus distinguishable from those in *Gonzalez* and *Recalde*. In *Gonzalez*, we held that the officer's suspicion of drug trafficking did not rise to the level of probable cause, and that the defendant did not consent to the removal to the police station. 763 F.2d at 1132.

In *Recalde*, we determined that the officers did not have probable cause to arrest the detainee for either a stolen vehicle or possession of narcotics, and that the trip to the police station was an impermissible fishing expedition designed to generate such cause. 761 F.2d at 1456.

cutor did not use ethnicity or nationality in an attempt to manipulate the jury.

The same is true in this case. In the first sentence noted by defendant, the prosecutor reminded the jury not to infer a predisposition to commit crime from the fact that defendant was an illegal alien. The rest of the discussion focused on the difficulty faced by illegal aliens in obtaining lawful employment, and commented on the level of motivation an illegal alien might have to earn money illegally. Defendant interprets these statements as saying: "Of course, SOTO was a drug courier. After all, he is Hispanic and what else would he be doing for a living?" Appellant's Br. at 26. We cannot agree that a jury necessarily would draw the same inference. In any event, as in *Abello–Silva*, the evidence against defendant was "abundant." Defendant and his companion had recently purchased, with cash, one-way airline tickets from Chicago to Los Angeles, and were carrying five thousand dollars in cash when they were arrested. Even accepting defendant's interpretation of the prosecutor's statements, we cannot conclude that racial bias impermissibly infected the jury's deliberations. The prosecution's closing arguments were not so inflammatory as to constitute plain error.

AFFIRMED.

SEYMOUR, Circuit Judge, dissenting.

Mr. Soto was stopped early on a December morning while driving his uncle's car. The temperature was eight degrees above zero and the car heater was broken. Mr. Soto's hands were shaking and he could not provide his uncle's address. The majority concludes as a matter of law that these innocuous facts provide the basis for an objectively reasonable suspicion that Mr. Soto was carrying drugs or weapons in the car. I cannot agree and I must therefore respectfully dissent.

As the majority recognizes,

the officer making a traffic stop may request a driver's license and registration, run a computer check, and issue a citation. Once the driver has produced a valid license and proof that he is entitled to operate the car, "he must be allowed to proceed on his way, without being subject to further delay by police for additional questioning."

*United States v. Walker*, 933 F.2d 812, 816 (10th Cir.1991) (quoting *United States v. Guzman*, 864 F.2d 1512, 1519 (10th Cir. 1988), *cert. denied,* —— U.S. ——, 112 S.Ct. 1168, 117 L.Ed.2d 414 (1992). "Any further detention for questioning is beyond the scope of the *Terry* stop and therefore is illegal unless the officer has a reasonable suspicion of unlawful activity." *United States v. Dewitt*, 946 F.2d 1497, 1501–02 (10th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1233, 117 L.Ed.2d 467 (1992).

In assessing whether an officer has reasonable suspicion to further detain and question a person on matters unrelated to the traffic violation, we apply the analysis used by the Supreme Court in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *See Dewitt*, 946 F.2d at 1501. Because *Terry* is the source of the reasonable suspicion doctrine, it is appropriate to return to that case for guidance on the principles governing our determination of this question. In *Terry*, the Supreme Court upheld a limited warrantless intrusion on Fourth Amendment interests when that intrusion is supported by reasonable suspicion of criminal activity. The Court stated unequivocally that the authority to trench upon these constitutional protections must be *"narrowly drawn."* *Terry*, 392 U.S. at 27, 88 S.Ct. at 1883 (emphasis added).

[I]n justifying the particular intrusion *the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.* The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. *And in making that assessment it is*

*imperative that the facts be judged against an objective standard;* would the facts available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate? Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction. And simple " 'good faith on the part of the arresting officer is not enough.' * * * If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be 'secure in their persons, houses, papers and effects,' only in the discretion of the police."

*Id.* at 21–22, 88 S.Ct. at 1880 (citations and footnotes omitted) (emphasis added).

The facts upon which the majority relies here simply do not provide the basis for an objectively reasonable inference that Mr. Soto was carrying drugs in the car. While detaining Mr. Soto, Officer Barney twice questioned him on matters unrelated to his speeding offense. The first time, Mr. Soto provided his driver's license and the car registration with shaking hands and did not respond when Officer Barney asked him to recite his uncle's address. Thereupon Officer Barney asked Mr. Soto if he had drugs or weapons in the car. The majority recognizes that we have held nervousness alone does not support a reasonable suspicion of criminal conduct, *see Walker,* 933 F.2d at 817, *Guzman,* 864 F.2d at 1520; *see also United States v. Tapia,* 912 F.2d 1367, 1371 (11th Cir.1990). The majority also recognizes that Mr. Soto's shaking could well have been caused at least in part by the extreme cold. Nonetheless, the majority concludes that reasonable suspicion existed as a matter of law because in addition Mr. Soto could not state his uncle's address. Even assuming that these two facts

could support a reasonable inference of criminal activity, the *only* criminal activity that could be rationally related to these facts is the suspicion that Mr. Soto was driving a stolen car.

Officer Barney questioned Mr. Soto a second time on matters unrelated to the speeding violation after Officer Barney had written a ticket and received an NCIC report indicating that the car had not been reported stolen. Even assuming that the facts had previously allowed a reasonable inference that the car was stolen, and that this inference somehow justified questions about drugs and guns, once the NCIC check came back negative the basis for inferring criminal activity of any sort evaporated. The only circumstance offered by the majority to support this additional questioning is the fact that Mr. Soto was still nervous.[1]

I cannot agree that under our caselaw Officer Barney had an objectively reasonable suspicion justifying his questioning about weapons or narcotics. At most, the facts originally may have entitled Officer Barney to suspect a stolen car. The reasonableness of even that inference disappeared after the negative NCIC report. We are left to determine whether a reasonable suspicion of the presence of illegal drugs or guns can objectively arise from nervousness and shaking hands in eight-degree weather coupled with the failure to provide a relative's address upon request. In holding that it does, the majority relies on cases which, as the majority's description of them reveals, contain circumstances in addition to those present here that make a more compelling case for reasonable suspicion. *See* maj. at 1555.

None of the cases cited by the majority contain so little to arouse suspicion as the present case does. For example, in *United States v. Horn,* 970 F.2d 728 (10th Cir. 1992), in addition to the extremely suspicious ownership papers noted by the major-

---

1. Officer Barney testified that he had a feeling or hunch or suspicion that the car contained drugs at the time he stopped the car and before he ran the NCIC check. This suspicion was apparently based primarily on Mr. Soto's nervousness. *See* Appellee's Supp.App. at 34–35.

Absent reasonable objective circumstances, a "hunch," of course, does not justify a seizure. *See Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968); *United States v. Guzman,* 864 F.2d 1512, 1520 (10th Cir.1988).

ity, we pointed as well to the "unusual and provocative way defendant pulled his car to a stop at an angle to the highway," *id.* at 732. However, the suspicious-looking and irregular papers in *Horn* are enough to distinguish that case. The majority here also makes an unjustified leap in equating Mr. Soto's failure to provide his uncle's address with "an inability to explain the right to possession of the vehicle." Maj. at 1555 n. 2. In *United States v. Turner,* 928 F.2d 956, 958–59 (10th Cir.1991), defendant's attire, well-manicured hands, and expensive possessions were inconsistent with his asserted occupation as a mechanic in the view of the police officer who was also a mechanic. Moreover, the police officer had returned the driver's license and car registration before asking questions regarding guns and drugs, a critical distinction from the present case. In *United States v. Pena,* 920 F.2d 1509, 1511–12 (10th Cir.1990), the police officer was justly suspicious when the driver said the car belonged to his brother but the officer determined that the car was registered to a woman the driver admitted he did not know. In *United States v. Arango,* 912 F.2d 441, 443 (10th Cir.1990), unlike here, the police officer could observe the lack of luggage in the bed of the truck to undermine the driver's story of a two week vacation trip, in addition to the lack of credible information establishing his right to possess the truck. In *United States v. Corral,* 899 F.2d 991 (10th Cir.1990), the officer observed that the spare tire was out of place on top of the hatch floor, and that the floor of the hatch was bulged where the spare tire should have been. In addition, there is no indication the officer possessed the driver's license, which the driver "showed" to the officer, *see id.* at 992, when the officer asked the question regarding drugs and weapons. Finally, in *United States v. Rivera,* 867 F.2d 1261 (10th Cir. 1989), the officer smelled "a strong odor of car freshener," which he had learned to associate with attempts to conceal the presence of cocaine, *id.* at 1262, in addition to the factors the majority mentions, *see* maj. at 1555.

As these cases demonstrate, none of our prior decisions upholds a finding of reasonable suspicion based solely on nervousness and something as common and innocent as the inability to provide the address of a relative. Indeed, the majority sanctions "as 'reasonably suspicious' a combination of factors that could plausibly describe the behavior of a large portion of the motorists engaged in travel upon our interstate highways." *Tapia,* 912 F.2d at 1371.

Finally, I cannot agree with the majority's articulation of the essential difference between its position and my dissent. *See* maj. at 1556. The issue as I see it is whether an objectively reasonable suspicion of the presence of drugs or guns can be based on a defendant who is nervous and shaking in cold weather and who does not provide the address of the person whose car he is driving when that car has not been reported stolen. In my view, these facts simply do not provide the requisite objective reasonable belief that a defendant is harboring drugs or guns. I disagree with the majority's position that an officer who has a reasonable suspicion of a particular criminal activity may therefore legitimately question a defendant about unrelated criminal conduct. The Supreme Court in *Terry* stated that the "demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence." 392 U.S. at 21 n. 18, 88 S.Ct. at 1880 n. 18. Accordingly, the Court held that *"in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which,* taken together with rational inferences from those facts, reasonably warrant *that* intrusion." *Id.* at 21, 88 S.Ct. at 1880 (emphasis added). If the Court's demand for specificity and particularity is to have any meaning at all in the context of a *Terry* stop, it must limit police intrusion to those questions that are themselves supported by a reasonable suspicion of criminal activity. To the extent that our cases can be read to support the majority's condoning of questioning unsupported by specific reasonable suspicion, they are contrary to the teaching of *Terry.*

Moreover, the specific issue was apparently not raised in the cases the majority cites, *see* at 1556.

The majority opinion flies in the face of fundamental Fourth Amendment jurisprudence by holding that reasonable suspicion as to one particular criminal activity justifies questioning about unrelated criminal conduct for which an officer does not have reasonable suspicion. In addressing the particularity requirement in the related context of searches pursuant to a warrant, the Supreme Court has emphasized that

> [b]y limiting the authorization to search to the specific areas and things for which there is probable cause to search, the [particularity] requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit.... "Just as probable cause to believe that a stolen lawnmower may be found in a garage will not support a warrant to search an upstairs bedroom, probable cause to believe that undocumented aliens are being transported in a van will not justify a warrantless search of a suitcase."

*Maryland v. Garrison*, 480 U.S. 79, 84–85, 107 S.Ct. 1013, 1016, 94 L.Ed.2d 72 (1987) (quoting *United States v. Ross*, 456 U.S. 798, 824, 102 S.Ct. 2157, 2172, 72 L.Ed.2d 572 (1982)). We have pointed out that " '[t]he particularity requirement ensures that a search is confined in scope to particularly described evidence relating *to a specific crime for which there is demonstrated probable cause.*' " *United States v. Snow*, 919 F.2d 1458, 1461 (10th Cir.1990) (emphasis added) (quoting *Voss v. Bergsgaard*, 774 F.2d 402, 404 (10th Cir.1985)). *See also Voss*, 774 F.2d at 408 (Logan, J., concurring) ("The breadth of a warrant must be justified by the breadth of the probable cause."); 1 Wayne R. LaFave & Jerold H. Israel, Criminal Procedure § 3.4(f) at 227 (1984) ("[T]he requirement of particularity is closely tied to the requirement of probable cause to search.").

The circumstances in this case, applicable as they are to a large segment of the public, do not comply with the Supreme Court's admonition that the authority to undertake a warrantless seizure upon reasonable suspicion must be narrowly drawn. Moreover, there is no rational, specific, articulable relation between the facts upon which Officer Barney purported to rely and an objectively reasonable suspicion that Mr. Soto was carrying drugs or weapons. I must respectfully dissent from the majority's holding to the contrary. Accordingly, I would hold that the detention and further questioning of Mr. Soto was illegal.