**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 29 2003**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

THOMAS L. BLACKBURN,

Defendant - Appellant.

No. 02-5173
(D.C. No. 01-CR-86-H)
(N.D. Oklahoma)

**ORDER AND JUDGMENT**[*]

Before **TACHA**, Chief Judge, **BRORBY**, Senior Circuit Judge, and **O'BRIEN**, Circuit Judge.

On July 25, 2002, Defendant-Appellant, Thomas L. Blackburn, entered a conditional guilty plea to one count of possession of marijuana with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), reserving his right to appeal the district court's denial of his motion to suppress. Defendant filed a timely notice of appeal. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and AFFIRM.

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

I.  Background[1]

On May 12, 2000, Oklahoma Highway Patrol ("OHP") Trooper Gene Hise was working a "stationary radar" at mile marker 286 on the Will Rogers Turnpike. Defendant Blackburn was traveling eastbound on the turnpike in a Ford F-150 pickup truck when Trooper Hise clocked his speed at 52 miles per hour.  The posted speed limit was 45 miles per hour[2] — the area was a designated construction zone — and there were construction workers present.  Trooper Hise stopped Blackburn, based on the fact that Blackburn's speed exceeded the posted speed limit.

Apparently, on May 12, 2000, the Oklahoma Turnpike Authority had not changed the speed limit for the area in question, in accordance with the applicable procedures under Oklahoma law.[3]  Accordingly, despite the fact that the posted

---

[1] We note that, regarding certain disputed issues of fact, the district court found Trooper Hise's testimony to be "credible" and Defendant Blackburn's testimony to be "not credible."  Dist. Ct. Order at 1, 8, 9.  Because we do not find this determination to be clearly erroneous, we do the same.  *See United States v. McRae*, 81 F.3d 1528, 1533 (10th Cir. 1996) ("Determinations of witness credibility [are] review[ed] for clear error.").

[2] It is not clear from the record whether the signs were posted by the Oklahoma Turnpike Commission or by one of the construction firms doing work on the turnpike.  According to the affidavit of Oklahoma Transportation Authority's chief engineer, Stacey Trumbo, "[a]ny signs, cones, or barrels present at Mile Marker 287 on the Will Rogers Turnpike on May 12, 2000, were not placed there by the Oklahoma Transportation Authority."

[3] Under Okla. Stat. Ann. tit. 47, § 11-1401(I):  "The Oklahoma
(continued...)

speed limit was 45 miles per hour, the legal maximum speed was 75 miles per hour.[4]  Officer Hise was not aware of the fact that the posted speed limit, 45 miles per hour, did not accurately reflect the legal speed limit as established by the Oklahoma Turnpike Authority.[5]

Trooper Hise requested that Blackburn accompany him to his squad car. During his initial contact with Blackburn, Trooper Hise observed the following: "[Blackburn] was uptight.  He wasn't making a lot of eye contact with me.  His belly was quivering.  His carotid artery in his neck was extremely fast, his pulse, his heart rate was — was up."  On cross-examination, Trooper Hise stated all of these factors boiled down to "nervousness."  Trooper Hise informed Blackburn that he was going to issue a "courtesy warning," but Blackburn's nervousness

---

[3](...continued)
Transportation Authority is . . . authorized to prescribe maximum and minimum speeds for trucks, buses and automobiles using turnpikes. . . .  Such regulations shall become effective only after approval by the Commissioner of Public Safety, and after signs have been posted on the turnpike giving notice thereof."  Apparently, the Oklahoma Transportation Authority has delegated certain responsibilities relating to construction zones to the Oklahoma Turnpike Authority.

[4] The government stipulated to this fact at the motion to suppress hearing.

[5] As the district court noted, even if Blackburn did not exceed the speed limit established by the Oklahoma Turnpike Authority, he was still in violation of Oklahoma law.  Under Okla. Stat. Ann., tit. 47, § 11-1401(K), "All vehicles traveling on a turnpike shall comply at all times with signs placed on the turnpike regulating traffic thereon."  It is undisputed that, at the time in question, the posted speed limit was 45 miles per hour.

persisted.  Trooper Hise also noticed that Blackburn was at times "unresponsive."[6]

While filling out the citation form, Trooper Hise asked Blackburn a number of questions, including his starting point, destination, and whether he owned the vehicle.[7]  On cross examination, defense counsel asked Trooper Hise whether these questions were "necessary to finish and to do the purpose of filling out that particular warning"?  Trooper Hise responded, "I would say no, sir."

After Blackburn signed the warning, he exited Trooper Hise's squad car and headed back towards the truck.  By this time, Trooper Hise's partner, Trooper Buddy Lambert, had arrived at the scene.[8]  Trooper Hise told him to "slow down" and "be careful on his trip" and that he was "free to go."  Before Blackburn opened the driver-side door, however, Trooper Hise asked "if he had a minute . . . [to] visit with him."  At the time of this request, Trooper Hise was standing at the rear of the truck, approximately nine feet from Blackburn, while Trooper Lambert was standing between the squad car and the truck.  Blackburn responded, "Sure."[9]

_____

[6] Blackburn later advised Trooper Hise that he had a hearing problem.

[7] Blackburn was not the registered owner of the truck.

[8] At some point during his conversation with Blackburn, Trooper Hise requested that his partner, Trooper Buddy Lambert, come to the scene.

[9] Trooper Hise testified that if Blackburn had not consented to the additional questioning, he would have detained him.  In response to defense

(continued...)

- 4 -

Trooper Hise first asked Blackburn why he was so nervous. Trooper Hise then asked whether there was "anything illegal in the truck," to which Blackburn responded, "Not that I know of." At this point, Trooper Hise requested Blackburn's permission to search the truck. Blackburn responded, "Go ahead." This occurred approximately fifteen minutes after the initial stop.

Trooper Hise first searched the cab area of the truck. He then proceeded to the back of the truck, but he realized that he could not access the "camper shell." Trooper Hise asked Blackburn for the key to the camper shell, and Blackburn told him that "there was no key." According to Trooper Hise's testimony, "then I walked back to the rear of [the truck] and I grabbed the tailgate handle and down the tailgate came." After the tailgate opened, Trooper Hise observed a baby's mattress and perceived the odor of raw marijuana.[10] Trooper Hise then advised Blackburn that he was under arrest and advised him of his *Miranda* rights. Government authorities later determined that the truck contained over 1,000

---

[9](...continued)
counsel's question concerning whether Blackburn was really "free to go," Trooper Hise responded, "No, sir, I was lying to him." Trooper Hise testified that "in my internal dialect he was under investigative detention." In fact, Trooper Hise indicated that, based on his training, "[he knew] that they have to be free to go before [he] can say 'oh, by the way.'" The fact remains, however, that Trooper Hise represented to Blackburn that he was free to go. Furthermore, Blackburn clearly believed he was free to leave because he proceeded to turn around and start back toward the truck.

[10] Trooper Hise testified that he is very familiar with the smell of marijuana.

pounds of marijuana.

On July 25, 2002, Blackburn conditionally pled guilty to one count of possession of marijuana with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), reserving his right to appeal the district court's denial of his motion to suppress. This appeal followed.

## II. Discussion

### A. Standard of Review

We review the district court's denial of a motion to suppress for clear error. *United States v. Soto*, 988 F.2d 1548, 1551 (10th Cir. 1993) (citations omitted). In conducting our review, we consider the evidence in the light most favorable to the district court's ruling. *Id.* (citations omitted). We review de novo, however, the ultimate determination of reasonableness under the Fourth Amendment. *Id.* (citations omitted).

### B. Whether Trooper Hise's Search of Blackburn's Truck and Seizure of the Marijuana was Constitutional Under the Fourth Amendment.

In reviewing the constitutionality of traffic stops under the Fourth Amendment, we conduct a two-step inquiry. First, we must determine "whether the officer's action was justified at its inception." *United States v. Gonzalez-Lerma*, 14 F.3d 1479, 1483 (10th Cir. 1994). Second, we must consider "whether the action was reasonably related in scope to the circumstances that first justified

the interference." *Id.* Further detention or questioning, unrelated to the traffic stop, is only permissible (1) where the officer "has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring," or (2) " if the initial detention has become a consensual encounter." *Id.* (citations omitted).

1. *The initial traffic stop*

"[A] detaining officer must have    an objectively reasonable articulable suspicion that a traffic violation has occurred or is occurring before stopping [an] automobile." *Soto*, 988 F.2d at 1554 (citation omitted). In this case, "[o]ur sole inquiry is whether this particular officer had reasonable suspicion that this particular motorist violated 'any one of the multitude of applicable traffic and equipment regulations' of the jurisdiction." *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) (citation omitted).

Here, Trooper Hise had objectively reasonable, articulable suspicion that Blackburn's speed exceeded the posted legal maximum speed for the area in question, in violation of Oklahoma law. *See* Okla. Stat. Ann. tit. 47, § 11-1401(I) ("It shall be a violation of this section to drive a vehicle at a faster rate of speed than such prescribed maximum speed or at a slower rate of speed than such prescribed minimum speed."). Although the *posted* legal maximum speed did not reflect the *actual* legal maximum speed, Officer Blackburn's actions were still

reasonable, insofar as he was unaware of the discrepancy.[11]   Accordingly, we hold

that Trooper Hise's initial stop of Blackburn comported with the requirements of

the Fourth Amendment.    *See Soto*, 988 F.2d at 1554.

> 2.    *The investigative detention*

"During a routine traffic stop, the detaining officer may request a driver's

license and vehicle registration, run a computer check on the car and driver, and

issue a citation." *Id.* (citations omitted).  In addition, the detaining officer may

question the vehicle's occupants regarding their identity, travel plans, and

ownership of the vehicle.  *United States v. Rivera*, 867 F.2d 1261, 1263 (10th Cir.

1989).  Once an officer has issued a citation in a traffic stop, "'[i]f the driver

produces a valid license and proof of right to operate the vehicle, the officer must

---

[11] Blackburn's reliance on *United States v. Lopez-Valdez*, 178 F.3d 282 (5th Cir. 1999), *United States v. King*, 244 F.3d 736 (9th Cir. 2001), and *United States v. Twilley*, 222 F.3d 1092 (9th Cir. 2000), is unavailing, insofar as all three cases are factually distinguishable.  In this case, Trooper Hise was not mistaken as to the scope of the applicable law, Okla. Stat. Ann. tit. 47, § 11-1401(I).  Rather, he was simply unaware that, on May 12, 2000, the Oklahoma Turnpike Authority had not changed the official speed limit for the area in question, in accordance with applicable procedures under Oklahoma law.  Trooper Hise should not have been required to anticipate this fact.    *Cf. Michigan v. DeFillippo*   , 443 U.S. 31, 37-38 (1979) ("A prudent officer, in the course of determining whether respondent had committed an offense under all the circumstances shown by this record, should not have been required to anticipate that a court would later hold the ordinance unconstitutional.").    Further, Blackburn was still operating his vehicle in violation of Oklahoma law.  *See* Okla. Stat. Ann. tit. 47, § 11-1401(K) ("All vehicles traveling on a turnpike shall comply at all times with signs placed on the turnpike regulating traffic thereon.").

allow him to continue on his way without delay for further questioning.'" *Soto*, 988 F.2d at 1554 (citing *United States v. Pena*, 920 F.2d 1509, 1514 (10th Cir. 1990)).

In this case, Trooper Hise issued a warning citation and the overall duration of the detention was approximately fifteen minutes. [12] Further, Trooper Hise's questions while issuing the citation related to Blackburn's travel plans and ownership of the truck. Thus, under *Soto* and *Rivera*, Trooper Hise's actions were within the legitimate scope of the traffic stop. Once Trooper Hise returned Blackburn's documentation and finished issuing the citation, he told Blackburn he was free to go and Blackburn started to return to his truck. At this point, Trooper Hise's continued questioning of Blackburn was proper because the encounter between Trooper Hise and Blackburn became consensual. *See United States v. Hernandez*, 93 F.3d 1493, 1498-99 (10th Cir. 1996) (finding that an encounter became consensual where officer returned license and registration, told defendant he was free to go, defendant turned to leave, and officer then requested without any show of force that defendant answer a few more questions).

3.    *The search*

In this case, the district court concluded that Blackburn voluntarily consented to Trooper Hise's search of his truck and that Trooper Hise's search

---

[12] Here, we refer to the time it took Trooper Hise to issue the warning.

did not exceed the scope of Blackburn's consent. Dist. Ct. Order at 8-9. For the reasons set forth below, we agree.

a. *Whether Blackburn Voluntarily Consented to the Search of His Truck.*

"Whether or not a party has voluntarily consented to a search is a question of fact that the district court must evaluate in view of the totality of the circumstances." *United States v. Doyle*, 129 F.3d 1372, 1377 (10th Cir. 1997) (citations omitted). In the present case, the district court found that Blackburn voluntarily consented, and "we must accept that finding unless it is clearly erroneous." *Soto*, 988 F.2d at 1557.

In *United States v. Dewitt*, we held that the defendant's consent was consensual based on the following facts: (1) the defendant answered "yes" to the trooper's request to search the vehicle; (2) the "defendant stood silently behind the automobile during the course of the search"; and (3) the trooper did not make any "show of force or intimidation." 946 F.2d 1497, 1500 (10th Cir. 1991).

The facts in this case are similar to *Dewitt*. Blackburn responded "Go ahead" when Trooper Hise requested permission to search his truck. Further, Blackburn was only a few yards from the truck during the search, and he raised no objections to Trooper Hise's actions. Finally, Blackburn does not contend that Trooper Hise or Trooper Lambert made any "show of force or intimidation." *Id.*

- 10 -

In light of these facts, we cannot conclude that the district court's conclusion was clearly erroneous. *Soto*, 988 F.2d at 1557.

> b. *Whether the Scope of Trooper Hise's Search was Reasonable.*

Whether a search remained within the boundaries of the consent is a question of fact, which we review for clear error based on the "totality of the circumstances." *United States v. Pena*, 920 F.2d 1509, 1514 (10th Cir. 1990). "'The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of "objective" reasonableness — what would the typical reasonable person have understood by the exchange between the officer and the suspect.'" *United States v. Ramstad*, 219 F.3d 1263, 1266 (10th Cir. 2000) (citation omitted). Ordinarily, an individual's consent to an officer's request to search his vehicle authorizes a thorough and complete search of the vehicle, absent either (1) a request by the officer with a limitation in scope, or (2) a limiting instruction included in the individual's consent. *See United States v. Elliott*, 107 F.3d 810, 815 (10th Cir. 1997) (citing cases).

In this case, Trooper Hise did not limit his request for consent. Nor did Blackburn's response ("Go ahead") in any way limit his consent. Although Blackburn argues that he subsequently limited the scope of his consent by telling Trooper Hise that he did not have a key for the camper shell, we disagree.

- 11 -

"'[T]he typical reasonable person [would not] have understood [this] exchange between [Trooper Hise] and [Blackburn]'" as limiting Blackburn's earlier consent. *See Ramstad*, 219 F.3d at 1266. Thus, Blackburn consented to a thorough search of his truck, and Trooper Hise's search pursuant to Blackburn's consent did not violate the Fourth Amendment.

### III. Conclusion

Based on the foregoing, we AFFIRM the district court's denial of Blackburn's motion to suppress and AFFIRM his conviction under 21 U.S.C. § 841(a)(1).

ENTERED FOR THE COURT,


Deanell Reece Tacha
Chief Circuit Judge