UNITED STATES of America, Appellee,

v.

Michael David BUTLER, Appellant.

No. 91–8054.

United States Court of Appeals,
Tenth Circuit.

June 2, 1992.

Matthew H. Mead, Asst. U.S. Atty. (Richard A. Stacey, U.S. Atty.; Maynard D. Grant, Sp. Asst. to the U.S. Atty., on the brief), Cheyenne Wyoming for appellee.

Robert B. Carroll, Cheyenne Wyo., for appellant.

Before MOORE and BRORBY, Circuit Judges, and HUNTER, Senior District Judge.*

ELMO B. HUNTER, Senior District Judge.

On July 12, 1990, a one count indictment was returned against Michael David Butler, charging him with possession of an unregistered sawed-off 12–gauge shotgun in violation of 26 U.S.C. §§ 5845(a)(2), 5861(d) and 5871. On May 22, 1991, Defendant entered a conditional plea of guilty under Fed.R.Civ.P. 11(a). Defendant was sentenced on August 14, 1991, to a period of 18 months incarceration, three years of supervised release, and assessed a $50 special assessment. Defendant's state conviction of delivery of methamphetamine was used to increase his criminal history category from I to II.

### STATEMENT OF FACTS

The Wyoming Department of Criminal Investigation investigated Defendant for methamphetamine trafficking in November and December of 1989. Officers Williams and Hughes testified that Defendant made deliveries of methamphetamine to Jeff Grover, a confidential informant, on November 16, 1989, and November 20, 1989. Around 7:00 p.m. on December 6, 1989, Grover went to Defendant's residence to purchase methamphetamine, while Officers Hughes and Williams conducted surveillance. As Grover entered Defendant's apartment, Defendant's police scanner signaled that Grover was wearing a wireless transmitter. Defendant became agitated and Grover fled.

Officer Hughes and three additional officers returned to Defendant's residence at approximately 7:30 p.m. to arrest Defendant on charges of delivering methamphetamine. Hughes observed Defendant and his twelve year old daughter, Brandy, exiting Defendant's pickup truck and approach-

* Honorable Elmo B. Hunter, Senior United States District Judge for the Western District of Missouri, sitting by designation.

ing the residence. Hughes arrested and handcuffed Defendant on his exposed back porch, while it was snowing. Officer Hughes testified that, at the time of the arrest, he advised Defendant of his constitutional rights and Defendant acknowledged those rights and did not request an attorney. Defendant testified that he was not advised of his rights; that he did request an attorney; and that he was questioned in violation of his rights. Defendant further testified that he is a former police officer; familiar with Miranda warnings; knew his rights; and that he had carried Miranda warning cards in 1979. Subsequently, Defendant testified that he had never carried a Miranda warning card.

Officer Hughes testified that Defendant gave permission to conduct a protective sweep of the premises. Defendant testified that Hughes never asked for permission to conduct a sweep, but told Defendant that he had a right to sweep the premises. Officer Hughes testified that Defendant's daughter was only on the porch "a minute or two" and was allowed to go in the house shortly after the officers entered to conduct the sweep. Hughes testified that Defendant was on the porch "five minutes at most" and he voluntarily consented to a warrantless search of his residence. Defendant testified that he and his daughter were kept on the porch for "fifteen, twenty or maybe thirty minutes," and that it was "freezing" outside and that his daughter was "crying, bawling and cold." Defendant testified that Hughes threatened to keep them on the porch "all night" until Defendant consented to a search or until a warrant was obtained, and that he gave his consent in order to get his daughter inside the house. Jennifer Anderson, Defendant's live-in girlfriend of ten months, testified that Defendant and his daughter were kept outside for "about fifteen-twenty minutes."

Hughes testified that, once inside the house, he asked Defendant and Anderson to read and sign a written consent to search form and that both individuals read and signed the forms. Hughes testified that Anderson stated to Defendant "it's not going to make any difference because they can get a warrant" and that Defendant replied "it's okay" to sign. The consent forms contained the following language:

This written permission is being given by me to special agents voluntarily and intentionally and no threats or promises have been made by the special agents to me.

Defendant testified that he signed the consent form because "I guess if I signed it we'd get in from the outside which I did." Defendant also testified that Hughes did not "ask Anderson to sign the form, but rather directed her to sign it." Anderson first testified that she was "asked" to sign the forms and then testified that Hughes "needed" her to sign, and Hughes stated that "if we didn't sign, we would be sitting there waiting until they got the search warrant," and then Defendant told her to "go ahead and sign." Anderson's final testimony was that she had read the form and that she supposed "we could have had a choice, but they would have come with a search warrant anyway."

After the consent forms were signed, Defendant informed the officers that the loaded sawed-off shotgun was hidden beneath the cushion in the couch, and there were additional firearms in his son's room. Defendant also showed the officers where he kept his scales, cut material, and related paraphernalia. Hughes testified that because of Defendant's cooperative nature, he allowed Defendant to drive himself down to the police station, and that he never threatened Defendant nor did he see Defendant threatened by any other officer.

The trial court denied Defendant's motion to suppress noting that there was a "clear conflict" in the testimony of Defendant and Officer Hughes and found Defendant's version not credible. The trial court made the following findings of fact: Defendant did not request an attorney; Defendant and his daughter were on the porch "a matter of a very few minutes"; Defendant voluntarily consented to the search of his residence; Anderson gave a valid consent to search; and that there was no evidence

of duress or coercion by the officers in obtaining the consents. The trial court's credibility determination was based upon the conflicting testimony and upon Defendant's inconsistent testimony regarding his prior police experience.[1]

## I. VOLUNTARINESS OF CONSENT

 Defendant argues that consent to a warrantless search of his residence was given under duress and coercion. "[W]hether a consent to search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined by the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). A trial court's factual findings regarding consent are viewed under the clearly erroneous standard. *United States v. Price*, 925 F.2d 1268, 1269 (10th Cir.1991).[2] "Under the clearly erroneous standard, the trial court will not be reversed unless its findings were without factual support in the record, or if after reviewing all the evidence, the appellate court is left with the definite and firm conviction that a mistake has been made." *United States v. Beaulieu*, 900 F.2d 1537, 1540 (10th Cir.1990).

 A warrantless search of a suspect's premises is, per se, unreasonable under the Fourth Amendment unless the government shows that the search falls within one of a carefully defined set of exceptions, *Coolidge v. New Hampshire*, 403 U.S. 443, 474, 91 S.Ct. 2022, 2042, 29 L.Ed.2d 564 (1971), such as a valid consent. *Schneckloth v. Bustamonte*, 412 U.S. at 219, 93 S.Ct. at 2043. Consent is valid, if voluntarily provided, and is not the product of duress or coercion, either express or implied. *Id.* at 227, 93 S.Ct. at 2047.

 To admit evidence obtained from a search, wherein consent was given, the following must be found:

(1) There must be a clear and positive testimony that consent was unequivocal and specific and freely given; and

(2) The government must prove consent was given without duress or coercion, express or implied.

*United States v. Price*, 925 F.2d at 1270–71. Here, there is no question that consent was given and that it was specific. The question is whether the consent was given with or without coercion or duress.

The testimony regarding consent was controverted. Officer Hughes testified that immediately after arresting Defendant on the back porch, he requested Defendant's permission to do a safety sweep of the premises to determine whether other individuals were present in the house, and that Defendant consented. Hughes further testified that Defendant's daughter, Brandy, was only on the porch "a minute or two," and was allowed to go in the kitchen area shortly after the officers began a protective sweep. Hughes stated that he advised the Defendant of his constitutional rights and acknowledged that he understood them. Hughes further testified that he asked Defendant to search the residence and consent was given. Once inside, Defendant was asked to sign the written consent form and did so. Hughes testified that Defendant was on the back porch "five minutes at the most" and that he never threatened Defendant.

Defendant's testimony sharply contrasted that of Officer Hughes. Defendant testified he was on the back porch for fifteen to thirty minutes in a driving snowstorm and that Hughes threatened to keep them outside until he gave consent or until a

---

**1.** Officer Hughes testified that the defendant told him during the search that he had been a police officer "for several years" in Lovell, Wyoming, that he liked being a cop, and that he "used to arrest people all the time." At the hearing, defendant testified that he had only been a part-time officer for "six, nine, ten months," that he did not have any formal training in police work, and that he had never made an arrest. Subsequent to the hearing, the U.S. Probation Officer reported that defendant had

been a part-time police officer in Lovell, Wyoming, for approximately six months during 1977 and 1978, and that he had received no formal police training.

**2.** This case must be viewed in the light most favorable to the trial court's findings. *United States v. Guglielmo*, 834 F.2d 866, 868 (10th Cir.1987).

search warrant was obtained. Defendant also claims that he requested an attorney and was denied one. Anderson testified similarly that Defendant and his daughter were kept outside about fifteen or twenty minutes.

This contradictory testimony required the trial court to make a credibility determination. After hearing the testimony, the trial court rejected Defendant and Anderson's testimony of post-arrest events. Viewed in the light most favorable to the district court's findings, *U.S. v. Guglielmo*, 834 F.2d at 866, 868 (10th Cir.1987), the record fully supports the trial court's findings. Defendant voluntarily gave verbal consent when he was on the porch and written consent once inside the residence.

■ Anderson's consent was effective if she had a sufficient relationship to the property searched. *United States v. McAlpine*, 919 F.2d 1461, 1463 (10th Cir.1990). The government bears the burden of proving by a preponderance of the evidence that the consenter had mutual use of the property searched, by virtue of her joint access to it. *Id.* Anderson had joint access to the searched premises, inasmuch as she had lived with Defendant and shared the same bedroom. The government showed that Anderson had mutual access to the property and was in a position to give effective consent to a search. *See e.g. United States v. Matlock*, 415 U.S. 164, 168–69, 94 S.Ct. 988, 991–92, 39 L.Ed.2d 242 (1974) (finding that a sufficient relationship existed where consenter had slept with Defendant in the bedroom searched and kept clothes on the premises).

■ The question then is whether Anderson's consent was voluntary. The trial court found that Anderson "was fully aware of her rights at the time" she signed the consent form. Defendant argues that Anderson signed the consent form because Defendant told her to sign it. The voluntariness determination must be based upon the totality of the circumstances. *See Schneckloth*, 412 U.S. at 227, 93 S.Ct. at 2047. The record clearly depicts Anderson as being cognizant of the situation. Officer Hughes testified that when he asked

Anderson for consent to search she remarked to Defendant, "it's not going to make any difference anyway because they could get a warrant." Anderson testified that she and Defendant had a choice as to whether to sign, "but they would have come with a search warrant anyway." Against this backdrop, Defendant told Anderson to sign the consent form. The record supports the trial court's findings that Defendant and Anderson's consents were given voluntarily, and such findings cannot be deemed clearly erroneous.

## II. USE OF DEFENDANT'S PRIOR STATE DRUG CONVICTION IN CALCULATING HIS CRIMINAL HISTORY CATEGORY

■ This Court views the district court's application of the sentencing guidelines and facts under a "due deference" standard and reviews *de novo* the overall application of the guidelines for errors of law. *United States v. Banashefski*, 928 F.2d 349, 351 (10th Cir.1991).

■ Here, Defendant was given three criminal history points in the presentence report for his prior state court conviction on two counts of delivery of methamphetamine. This results in a criminal history category of II. Defendant argues that the state drug conviction "was part of the instant offense" and hence, not a "prior sentence" under U.S.S.G. § 4A1.2(a)(1). The Court found that the state offense constituted a "prior conviction" for guideline sentencing purposes, but did not make a finding as to whether the state offense involved conduct which was a part of the instant offense.

Three Criminal History points are added "for each prior sentence of imprisonment exceeding one year and one month." U.S.S.G. § 4A1.1(a) Prior sentence is defined as "any sentence previously imposed upon adjudication of guilt ... for conduct not part of the instance." U.S.S.G. § 4A1.2(a)(1). The state sentence at issue was a "prior sentence" even though it was imposed between the date of the instant

federal offense and the date of the federal sentencing. *Banashefski*, 928 F.2d at 351.

Defendant argues that the state drug conviction involved conduct that was part of the instant federal offense because there was testimony at the suppression hearing from government witnesses that Defendant used the sawed-off shotgun for protection during the drug transactions. The proper inquiry is not whether Defendant had possession of the shotgun on the dates he was dealing methamphetamine, but whether the conduct involving methamphetamine is part of the conduct of possessing an unregistered firearm. *See Banashefski*, 928 F.2d at 351. The indictment charges the Defendant with possessing an unregistered firearm on or about December 6, 1989, while Defendant's state conviction involved delivering methamphetamine on November 16, 1989, and November 20, 1989. Thus, the two crimes are separable by conduct and by chronology.

Whether Defendant possessed the shotgun during the drug transactions in November of 1989 is immaterial to the inquiry of whether each separate offense involved conduct that was part of the other. The conduct underlying the state conviction was drug trafficking, while the conduct underlying the federal conviction was possessing an unregistered firearm. Neither offense is dependent upon conduct associated with the other and neither shares a common element of proof, thus the relevant conduct underlying those convictions is severable and the trial court was not clearly erroneous in using Defendant's prior state drug conviction in calculating his criminal history category.

Accordingly, the decisions of the district court are hereby AFFIRMED.