UNITED STATES of America, Plaintiff,

v.

**Fortino GARCIA HERNANDEZ, and Luis Angel Villagomez, Defendants.**

**Civil No. 2:96–CR–76C.**

United States District Court, D. Utah, Central Division.

Dec. 17, 1996.

---

8. Which appeal process TRMC utilized on June 23, 1993. *See supra* ¶ 27.

Richard G. MacDoughall, Assistant United States Attorney, Salt Lake City, UT, for Plaintiff.

Michael D. Murphy, Kaysville, UT, Scott S. Kunkel, Salt Lake City, UT, for Defendants.

ORDER

CAMPBELL, District Judge.

This case is before the court on the defendants' motion to suppress evidence and statements. The case was referred to United States Magistrate Judge Ronald N. Boyce pursuant to 28 U.S.C. § 636(b)(1)(B). A hearing was held on the motion to suppress and memoranda were filed by the parties. On November 20, 1996, the Magistrate Judge filed a Report and Recommendation in which he recommended that the motions to suppress of the defendants be denied. Defendant Fortino Garcia Hernandez filed no objection to the Report and Recommendation. On December 2, 1996, defendant Luis Angel Villagomez filed an objection to the Report and Recommendation which states only a general objection, without making any specific objections to the Report and Recommendation.

The court has carefully reviewed the Report and Recommendation and finds it to be correct in all material respects. Accordingly, the court hereby adopts the Report and recommendation of the United States Magistrate Judge as the order of this court

IT IS HEREBY ORDERED that defendants motions to suppress are DENIED.

## REPORT & RECOMMENDATION

BOYCE, United States Magistrate Judge.

Defendants Fortino Garcia Hernandez and Luis Angel Villogomez have been indicted by a grand jury and charged in one count with possession of methamphetamine in excess of 100 grams with intent to distribute (File Entry # 10). The defendant, Luis Angel Villagomez, made a motion to suppress (File Entry # 17) alleging that evidence and statements were illegally obtained from him as the result of an illegal stop and search of a vehicle operated by Villagomez. The defendant Villagomez contends the officer did not have probable cause or reasonable suspicion for the stop of the vehicle, that a subsequent detention of Villagomez was illegal and the search of the vehicle cannot be validated on the basis of a consent search (File Entry # 18).

The defendant Fortino Garcia Hernandez made a motion to suppress contending that the stop of the vehicle driven by Villagomez, in which Garcia Hernandez was a passenger, was illegal and the ensuing search of the vehicle was also illegal.

The case was referred to the magistrate judge under 28 U.S.C. § 636(b)(1)(B). Hearing was held on the motion to suppress. Subsequent to the hearing, the United States submitted a memorandum in opposition to the defendants' motions to suppress contending the actions by the officer were lawful (File Entry # 26). Defendant Villagomez submitted a post hearing supplemental memorandum (File Entry # 27). Defendant Fortino Garcia Hernandez submitted a post hearing supplemental memorandum in support of his motion to suppress (File Entry # 28). This report and recommendation is submitted pursuant to the reference on the defendants' motions to suppress.

*Evidence*

Sergeant Fred A. Swain, Utah Highway Patrol (UHP), testified at the suppression hearing (Tr. pp. 5–6). He is a supervisor of a patrol area in Beaver and Iron counties in Utah. His responsibility is traffic patrol and enforcement of other criminal laws encountered in the patrol function. He has had training and experience in drug identification and interdiction (Tr. pp. 6–7). At about 6:48 a.m. on April 12, 1996 he was patrolling north of the Beaver south exchange on Interstate 15; he was in the median in his patrol vehicle. He observed a vehicle going northbound that did not have a light illuminating the rear license plate. Utah Code Ann. § 41–6–120 requires a rear light [1] (Tr. p. 8).

At 6:48 a.m. it was not dark as in the middle of the night but it was before sunrise. The defendants' vehicle was a sedan with headlights on, but the officer could not see the occupants except that there was a driver. He could not determine sex or race (Tr. p. 9). Because the rear plate was not illuminated the officer made a traffic stop with his lights and the vehicle pulled over (Tr. p. 10). As

the officer pulled the vehicle over, he could see it had California plates. He exited the vehicle and went to the driver's side of the vehicle. He observed a 12 pack box of Budweiser beer with four cans inside which items appeared unopened (Tr. pp. 10–11). Villagomez was driving the vehicle and Hernandez was a passenger. The officer requested a driver's license and registration. He told the driver that he was stopped because the light that shines on the rear plate was gone. The officer could smell the odor of an alcoholic beverage coming from the vehicle. While the occupants were getting the things the officer requested, he asked Villagomez where he was going (Tr. pp. 11–12). He said he was going to Ogden [Utah] to get work. Hernandez said the same thing.

Villagomez gave the officer a California driver's license. Hernandez gave the officer a title to the vehicle in the name of Roberto Guerrero with that name in the transfer or block on the title, but no name in the transferee block (Tr. pp. 13–14, Exh. # 1). The officer asked who owned the vehicle and Hernandez said he did (Tr. p. 14). The officer asked Hernandez for identification and Hernandez gave the officer a Utah identification card with an Ogden address (Tr. p. 15). This was after Hernandez had said he was going to Ogden to find work. The officer asked Hernandez where he lived and he said Ogden. Villagomez said he lived in California. At that point the officer became suspicious. He had not received a registration and the only person named in the title was not in the vehicle (Tr. p. 15).

The officer then asked Villagomez if he'd been drinking and he replied no. The officer had Villagomez blow on the officer's hand but the officer couldn't smell alcohol. Villagomez did admit he had been drinking earlier in the night. The officer went to his patrol car to write out a notice violation for the light violation and he called his dispatcher for a check on the vehicle (Tr. p. 16). The dispatcher advised Officer Swain that a check was being run on the status of the vehicle, but the computer was backed up and there would be

---

1. Utah Code Ann. § 41–6–120(b) requires a tail or separate lamp ... to illuminate with a white light the rear registration plate. § 41–6–118 re-

quires lighting one half hour before sunrise and other times when vehicles are not clearly discernible.

ten to fifteen minutes delay (Tr. p. 16). Officer Swain decided to exit his vehicle and investigate some matters about which he still had suspicion. He asked Hernandez to exit the vehicle and asked if he had a bill of sale or something to show title. Hernandez said he had nothing else. Swain decided to ask permission to search the vehicle. This was based on the alcohol factor and his belief the vehicle might contain an open container.[2] Second, he suspected a stolen vehicle and he might find property or something that would identify the owner of the vehicle (Tr. p. 17). The officer also suspected drug trafficking because of the statements of the suspects about one person living in Ogden and a California driver's license of the driver and going to Ogden. Also, the car was from California and the officer was aware of the way drug traffickers work in tandem (Tr. p. 18). Also, the small amount of luggage and the difficulty in determining the rightful owner of the vehicle was suspicious (Tr. pp. 18–19). Before asking for consent to search the vehicle, the officer asked Hernandez for additional information but Hernandez provided no additional documents. He said he had recently purchased the vehicle from the title owner, a Mr. Guerrero (Tr. p. 20).

At that point, the officer asked Mr. Hernandez if he could search the vehicle and Hernandez said "yes." Id. The officer then asked permission to search from defendant Villagomez. The officer asked if he could look through the entire vehicle and Villagomez said "yes" (Tr. pp. 20–21). The officer asked both persons to step out of the vehicle and the officer commenced a search. He searched the passenger area and found nothing. He took the key from the ignition and opened the trunk of the vehicle. Defendants originally were in the front of the vehicle (Tr. p. 21). On opening the trunk various items were observed (Tr. p. 22, Exh. # 2). As the officer was getting ready to close the trunk he noticed a roll of duct tape (Tr. p. 23, Exh. # 3). The officer leaned over to pick up the duct tape and looked into an open cardboard box where he observed a package wrapped in

duct tape (Tr. p. 25). The officer pulled out the package and asked Hernandez what was in the package and he said it was "pine" (Id.). The officer made further inquiry and Hernandez said it was pine wood like that used for cabinets (Tr. p. 26).

The officer then took a knife that was in the box and cut open the package. There were two packages inside. The officer could smell one of the packages and it smelled like marijuana. It was cut open and contained a pound of marijuana (Tr. p. 26). A second clear package was cut open and contained methamphetamine. There were a couple of other white powdery packages in plastic that contained the methamphetamine (Tr. p. 27, see Exh. # 4). The officer returned to his vehicle and requested a backup. He went to Hernandez and gave him a *Miranda*[3] warning (Id.). The warning was proper and complied with the pre-interrogation warning requirements (Tr. p. 28). The officer asked Hernandez if he understood his rights and he said yes. The officer asked if Hernandez would be willing to answer some questions and he said he would (Tr. pp. 28–29). The officer then told Hernandez that if he would be willing to deliver the drugs he could get out of some of the trouble he was in and Hernandez agreed. Then Hernandez was questioned about his role in the drug activity and made an incriminating statement about the activity including what he would be paid (Tr. pp. 29–30). Hernandez' cooperation led to the stop of another vehicle (Tr. p. 31).

Both Hernandez and Villagomez were arrested before being questioned (Tr. p. 31). After the statement from Hernandez, the officer gave a *Miranda* warning to Villagomez. The warning was read from a notebook and complied with the *Miranda* preinterrogation warning requirement. The officer asked Villagomez if he understood his rights and he replied that he did not. Therefore, the officer did not interview him (Tr. pp. 31–32). Both defendants had limited English. Hernandez evidenced a better understanding of English than did Villagomez. Both indi-

2. Utah Code Ann. § 41–6–44.20 prohibits possession, carrying, transporting, etc., in the passenger compartment of a vehicle, an open container that contains an alcoholic beverage.

3. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

viduals responded to the officer in English (Tr. p. 33). The officer had his weapon in his holster during the time. The defendants were transported when the backup officer arrived (Tr. p. 34). The officer never determined if Mr. Roberto Guerrero existed or who he was (Tr. p. 35).

When the officer initially followed the vehicle he could not determine the make, model, or license plate until he got close enough and it was pulling over (Tr. p. 36). The officer did observe the unopened beer cans and sundry items while approaching or talking to the driver (Tr. pp. 38–39). The vehicle registration showed the vehicle belonged to Robert Guerrero. This was on the computer but did not become known, because the computer was backed up, until shortly after the officer discovered the drugs (Tr. pp. 39–41). No registration was ever produced (Tr. p. 41). If the officer had not discovered the drugs, the vehicle may have been impounded for the registration violation (Tr. p. 42). Hernandez understood when the officer spoke to him in English (Tr. p. 45).

At the time, Officer Swain observed the defendants' vehicle, it was close to dawn and he was facing south. Defendants' vehicle had its headlights on and was going approximately 65 mph. The officer did not believe the vehicle was exceeding the speed limit and did not check it on radar. The officer looked over his left shoulder and observed the plate light was not working (Tr. pp. 5051). As soon as the light was observed the officer pulled onto the road and made the stop. The officer has stopped vehicles 10 to 20 times in the prior year for the same violation (Tr. pp. 51–52). At the time traffic was slow.

On approaching the driver, a request was made for a license and an apparently valid California license was produced (Tr. p. 54). Officer Swain does not issue a citation for a light violation but only gives a warning (Tr. p. 55). The officer did not return the license or vehicle title to Villagomez (Tr. p. 58). The officer had the title to the vehicle but did not know to whom the vehicle belonged. There was no registration and there was a registration violation (Tr. pp. 59–60). The request for consent to search occurred before the return of any documents to the defendants (Tr. p. 61). The officer wanted to search the vehicle. The officer received consent to search the vehicle. Villagomez was asked if the officer could "look through the entire vehicle" and Villagomez said "yes." Based on that statement, and the prior statement of Mr. Hernandez, the officer searched the trunk (Tr. p. 65). A search of the vehicle was the only reasonable way to know if the vehicle was stolen when the computer was down. Also, many stolen vehicles are not in the NCIC (National Crime Information Center) data base (Tr. pp. 68–69). The officer did not ask either defendant if he could look inside the package he found in the trunk (Tr. p. 69, Exh. # 4). The officer felt he had reason to believe the package contained drugs. He had not seen a package wrapped with duct tape that did not contain drugs. He had seen it scores of times (Tr. p. 69). The requested consent did not expressly mention packages. The time from the stop until the finding of the drugs was about 15 minutes. At no time did either defendant request that the search stop (Tr. pp. 70–71).

Sergeant David Excell, with the Utah Department of Public Safety, Utah Division of Investigations (UDI), testified (Tr. p. 74). He has had 18½ years as a peace officer (Id.). On April 12, 1996 he was contacted by Sergeant Swain who asked Excell to go to the Beaver County Sheriff's office because Swain had made an arrest and discovered contraband (Tr. p. 75). Excell went to the Beaver County Jail and Sheriff's office and talked briefly with Sergeant Swain about what had occurred. He interviewed the defendants (Tr. p. 76). Each individual was separately interviewed. Villagomez was interviewed first. Prior to the interview Villagomez was asked if he had been given a preinterrogation warning by Sergeant Swain and Villagomez said he had. Excell then carefully went through the *Miranda* advice because of Villagomez' difficulty in understanding English. Villagomez appeared to understand (Tr. pp. 77–79). He did not indicate that he did not understand and he agreed to talk to Excell (Tr. p. 79). Villagomez then made a statement giving extensive information on a drug transporting operation (Tr. pp. 80–81). The conversation lasted 15 to 20 minutes (Id.).

The next interview was with defendant Hernandez. Hernandez was given a full *Miranda* warning that met the specifics of the warning requirement (Tr. pp. 81–82). Hernandez agreed to speak with the officer. Thereafter, Hernandez gave a statement.[4] No threats were made (Tr. p. 84).

The *Miranda* advice given to each defendant was in English. Excell repeated the advice to Villagomez until Excell was satisfied Villagomez understood what was said. Villagomez did not indicate a lack of understanding.

The defendant Fortino Garcia Hernandez testified that he is forty years old, has no formal education and cannot read English and only a little Spanish (Tr. p. 89). The vehicle in which he was riding was purchased by him, part in cash and part through winnings in a poker game (Tr. pp. 89–90).[5] The officer who asked to search (Sergeant Swain) only asked to search the inside of the car and Hernandez said yes. The officer did not ask to search the trunk. No *Miranda* warning was given to Hernandez and he does not understand all the *Miranda* warning (Tr. pp. 91–92). Hernandez told Swain that Hernandez did not understand what Swain was saying (Tr. p. 93). Hernandez has lived in the United States for 23 years (Tr. p. 94).

Defendant Luis Villagomez testified. He stated he can understand some English (Tr. p. 96). He was operating the vehicle on April 12, 1996. He could see clearly. He could see the sun a little (Tr. p. 97). The officer turned his lights on as he pulled on the pavement to pull over defendants' vehicle. The defendants' vehicle lights were on (Tr. p. 98). The officer pulled over the vehicle, approached and asked for a license and registration. Villagomez gave the officer a California driver's license. Villagomez had been living in Ogden, Utah since 1993 (Tr. p. 99).

Swain took the documents and went back to his vehicle. He did not return the items (Tr. p. 100). The officer was in his vehicle for about ten minutes. He returned and asked Hernandez if the officer could check the car and told the defendants to get out of the car (Tr. pp. 100–101). After Villagomez got out of the car the officer explained Villagomez' rights but he did not understand. Officer Swain asked if he could search the vehicle, but he only asked Hernandez. He only asked to search the inside of the vehicle (Tr. pp. 101–102). Villagomez was only asked by the officer if he could check the car, he didn't say the entire car. When the officer asked if he could search the car, Villagomez said he could. Villagomez thought the officer would only look inside (Tr. p. 103). At no time did he ask to search the trunk. Villagomez understood the officer's request to search (Id.). The officer did not say why (Id.). Swain never told the defendants they were free to leave (Tr. p. 105).

When Villagomez was questioned at the Beaver County jail, he did not understand the explanation as to his rights (Id.). Villagomez did understand the officer wanted some kind of cooperation (Id.).

When Officer Swain asked if he could look into the vehicle, Villagomez understood but thought it was to check the car (Tr. p. 106). Villagomez told the officer yes. He told Officer Excell that Villagomez did not understand the advice of rights given to him (Tr. p. 107). He did answer some questions (Id.). Hernandez and Villagomez said it was 10 to 15 minutes from the stop until they were ordered out of the car (Tr. pp. 107–108). There was no request to search the packages in the vehicle (Tr. p. 109).

Based on the above evidence the court enters the following:

*Findings of Fact*

1. On April 12, 1996 at around 6:48 a.m., Sergeant Swain of the Utah Highway Patrol was on traffic patrol north of Beaver, Utah on I–15. He was in the median and noticed a vehicle going north. The sun had not yet come up, it was dark just about dawn, but not as dark as midnight. The northbound vehicle had its lights on. Traffic was slow.

---

4. Hernandez told Officer Excell that the vehicle had been won by Hernandez in a poker game (Tr. p. 83).

5. The Government does not contest standing of the defendants (Tr. p. 90).

After the vehicle passed, Officer Swain noticed there was no illumination light over the rear license plate. When traffic is slow, the officer stops such vehicles and gives a warning notice to the driver. It is a violation of Utah law to operate a vehicle under those conditions without a light illuminating the rear plate. Officer Swain pursued the vehicle and pulled it over for the traffic and equipment violation.

2. The officer could not tell the number of occupants in the vehicle, or who they were or their sex or race until the vehicle stopped. As the vehicle was stopped, the officer could see it had California license plates. The officer approached the driver and asked for a driver's license and registration. Defendant Villagomez was driving the vehicle and defendant Hernandez was in the front passenger seat. On request, Villagomez provided the officer with a California driver's license that appeared valid. No registration for the vehicle was ever presented. Hernandez gave the officer a title to the vehicle which was in the name of Roberto Guerrero. The title had been executed for transfer in blank but there was no transferee listed in the title transfer block. As the officer approached the vehicle, he saw a twelve pack Budweiser beer carton with four unopened cans inside the vehicle. The officer advised the two occupants that the vehicle was stopped because the rear plate light was gone. The officer could detect an odor of alcohol coming from the vehicle.

3. While the occupants were getting the items the officer asked for, he asked Villagomez where he was going and he said he was going to Ogden, Utah to get work. Hernandez said the same. When the items were produced the officer asked who owned the vehicle and Hernandez said he did. The officer asked Hernandez for identification and he gave the officer a Utah identification card which had an Ogden address. This was after Hernandez had said he was going to Ogden to get work. The officer asked Hernandez where he lived and he said Ogden. Villagomez said he lived in California. At that point the officer became suspicious as he also had not received a registration and the only person named in the vehicle title was not in the vehicle.

4. The officer asked Villagomez if he'd been drinking and he said no. The officer had Villagomez blow on the officer's hand but the officer could not smell alcohol, although Villagomez admitted he had been drinking earlier in the night. The officer went to his patrol car to write out a notice violation for the light violation. He called in to the dispatcher for a check on the driver's license and vehicle title. The officer was advised the computers were backed up and there would be a 10 to 15 minute delay. Officer Swain decided to investigate further and asked Hernandez if he had a bill of sale or something to show that he had title. Hernandez said he had nothing, Swain decided to ask for permission to search the vehicle. The presence of the odor of alcohol and open twelve pack suggested maybe there was an open container in the vehicle, further, with no registration and an incomplete title, the officer suspected the vehicle may be stolen. The officer probably would have impounded the vehicle for inadequate registration until that matter was cleared up. The officer also had a suspicion the vehicle may contain drugs because of the statements made by the defendants as to the reason for going to Ogden, especially since Hernandez lived there. Also, the vehicle was from California and there appeared to be a small amount of luggage.

5. Officer Swain asked Hernandez if Swain could search the vehicle. No reasons were given for the search and Hernandez said yes. There were no location restrictions put on the request. The officer then asked the driver, defendant Villagomez, if the officer could search the whole vehicle and Villagomez said yes. Both individuals understood the officer's request and the assent of each person to the search was voluntary. The search request was not limited to any location or for any particular item. The officer then asked both defendants to step out of the car and stand in front of it. The officer searched the passenger compartment but found nothing illegal.

6. The officer then took the keys from the ignition and opened the vehicle trunk.

Neither defendant raised any objection. In the trunk was a tool box with items and various other things (Exh. # 2) including an open Penzoil box in which various loose items were located (Exh. # 3). The officer observed a roll of duct tape to the side of the box. As he bent to examine it, he saw a package wrapped in a grey or silver plastic with duct tape wrapped around it, located in the box. Based on the officer's experience packages wrapped in duct tape often contained drugs. The officer asked Hernandez three times what was in the package. Hernandez said "Pine" like for making furniture. The size of the package made the response doubtful. The officer took a knife from the open box and cut open the package (Exh. # 4). He did not request permission of either defendant to open the package. However, neither defendant objected to the officer's action and Hernandez knew of the officer's interest and had time to object. There is nothing in the structure of the package or its location that suggests the presence of drugs except the duct tape and plastic wrapping. There were no markings on the package and it was not hidden or secreted. Inside the package were two packages, one smelled like marijuana and contained one pound of marijuana. The second package contained two other white packages which contained methamphetamine. The defendants were placed under arrest.

7. Officer Swain gave defendant Hernandez a complete oral *Miranda* warning. Hernandez responded to a question from the officer that Hernandez understood his rights. The officer asked Hernandez if he would be willing to answer questions and he said he would. The officer told Hernandez if he was willing to complete the delivery he could get out of some trouble and Hernandez agreed. Hernandez made incriminating statements and this led to the stop of another vehicle involved in the drug transporting operation.

8. The officer then gave a *Miranda* warning to defendant Villagomez but did not question him further when he indicated he did not understand the warning as to his rights.

Both defendants speak English although not perfect. Hernandez has a better understanding of English than Villagomez. Hernandez has been in the United States for 23 years. The discussions of each defendant with Officer Swain were in English and defendants understood what was said. After their arrest and the on scene interrogation, Hernandez and Villagomez were taken to the Beaver County Jail and Sheriff's Office in Beaver City, Utah.

9. At the Beaver County Sheriff's Office, Sergeant David Excell of the Utah Division of Investigations questioned defendant Villagomez, after first having a conversation with Sergeant Swain. Prior to the interview, Villagomez was given a preinterrogation warning in English. Excell carefully and persistently went through each part of the *Miranda* advice because of Villagomez' difficulty with English. The advice was in English. Excell persisted in giving the preinterrogation advice until he was satisfied Villagomez understood his rights. Villagomez did not indicate that he didn't understand and he agreed to talk. He made an incriminating statement. The interview lasted from 15 to 20 minutes. The court finds that Villagomez did understand his rights and voluntarily agreed to speak to Sgt. Excell. His statements to the contrary are not credible or consistent with his overall behavior. Further, Villagomez' testimony shows a lack of credibility.

10. Officer Excell then interviewed Hernandez. A full and complete *Miranda* warning was given to Hernandez prior to the interview. Hernandez understood the advice. He had been given the advice before. No threats were made. The advice was in English. Hernandez agreed to speak with Excell and made a statement.

*Discussion*

*The Stop*

 The defendant Villagomez asserts the stop of the vehicle was illegal.[6] He con-

**6.** The United States has agreed Villagomez has standing to contest the search of the vehicle. This may be doubtful. *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). How-

ever, since the prosecution concedes standing that issue will not be addressed. *United States v. Dewitt,* 946 F.2d 1497 (10th Cir.1991). However, in any event, Villagomez could challenge the

tends there was neither reasonable suspicion or probable cause for the stop. The contention must be rejected. The court has found it was still dark at the time the of the stop. The ability to see was not as limited as if late at night, but it was around dawn and the officer could not clearly see. The sun had not yet come up.[7] The defendants' vehicle had its lights on and the officer turned the lights on on his vehicle to pursue defendants. The officer observed the undisputed fact that the plate light was out, he saw the condition of the vehicle as it passed and as he followed the vehicle. It was sufficiently dark so that the officer could not tell the make of the vehicle, the place of the license plates on the vehicle until it stopped, or the number of occupants in the vehicle.

Utah Code Ann. § 41–6–120(b) provides:

Either a tail lamp or a separate lamp shall be so constructed and placed as to illuminate with a white light the rear registration plate. Such lamp shall comply with requirements of the department.

The defendants' vehicle's rear license plate light didn't work and the taillights did not illuminate the rear plate. Utah Code Ann. § 41–6–118 provides that light would have to be working one half hour before sunrise and at a time that vehicles are not clearly observable at a distance of 1000 feet. The time of sunrise was not presented nor the evidence as to 1000 feet vision but evidence did show difficulty in clearly making out the vehicle and things about its identification. It was not yet sunrise. To make a vehicle stop an officer need only have reasonable suspicion of a violation. *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979); *United States v. Hensley,* 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985); *United*

*States v. Alvarez,* 68 F.3d 1242 (10th Cir. 1995). This need not be proof sufficient for probable cause or proof beyond a reasonable doubt. *Terry v. Ohio,* supra; *Alabama v. White,* 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990).

In *United States v. Botero–Ospina,* 71 F.3d 783 (10th Cir.1995) the court said "a traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the officer has reasonable articulable suspicion that a traffic or *equipment violation has* occurred or is occurring." *Id.* p. 787. (Emphasis added). See also *United States v. McRae,* 81 F.3d 1528, 1533 (10th Cir.1996).

In *Whren v. United States,* —— U.S. ——, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) the Supreme Court adopted a position the same as in *Botero–Ospina,* although *Whren,* spoke in terms of probable cause which was what existed under the facts of the case. *Id.* p. ——, 116 S.Ct. p. 1772. See also, *Ohio v. Robinette,* —— U.S. ——, ——, 117 S.Ct. 417, 420, 136 L.Ed.2d 347 (1996). The motive and relative minor nature of the offense are not factors. *Id.* Applying the above standards to this case, the officer had observed the equipment failure under circumstances that at the least indicated reasonable suspicion or probable cause for the stop. The stop of defendants' vehicle was lawful.

*Detention*

Each defendant contends that the detention of the defendants following the stop was impermissible. The officer, following the stop, asked the driver Villagomez, for a license and registration. Although a driver's license was produced, the vehicle registration was never produced.[8] Until the registration was produced or verified it could not be concluded that defendants had a lawful right to have the vehicle. Hernandez pro-

---

stop *United States v. Erwin,* 875 F.2d 268 (10th Cir.1989); *United States v. Eylicio–Montoya,* 70 F.3d 1158, 1163–64 (10th Cir.1995) and detention. *United States v. Shareef,* 100 F.3d 1491 (10th Cir.1996); *United States v. Miller,* 84 F.3d 1244, 1250 (10th Cir.1996).

**7.** The court rejects the testimony of Villagomez that it was daylight or that the sun was coming up.

**8.** The vehicle bore California license plates. California law requires the driver of a motor vehicle to display the registration to any police officer. Cal.Veh.Code § 4462. The officer testified that Utah law requires a registration.

duced a title, but the record owner, Robert Guerrero was not in the vehicle. Guerrero had apparently executed the title transfer in blank and did not fill in the name of the transferee. At this point it could not be determined who owned the vehicle. This raised a suspicion the vehicle was stolen or not properly registered. In addition, when asked where defendants were going the answers, given the fact that Hernandez was already a Utah resident, were odd.[9]

In *United States v. Guzman,* 864 F.2d 1512, 1519 (10th Cir.1988) the court said, "An officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation." See also *United States v. Gonzalez,* 763 F.2d 1127, 1130 (10th Cir. 1985); *United States v. Recalde,* 761 F.2d 1448, 1455 (10th Cir.1985); *United States v. Walker,* 933 F.2d 812, 816 (10th Cir.1991); *United States v. Pena,* 920 F.2d 1509, 1514 (10th Cir.1990); *United States v. Soto,* 988 F.2d 1548, 1554 (10th Cir.1993); *United States v. Gonzalez–Lerma,* 14 F.3d 1479, 1483 (10th Cir.1994) (overruled on other grounds in *Botero–Ospina,* supra); *United States v. McRae,* 81 F.3d 1528 (10th Cir. 1996). That is what officer Swain did in this case, he sought to run a computer check to see if defendants had a lawful right to possess the vehicle. Although the dispatcher indicated the computer was overloaded or down for ten to fifteen minutes, this was not an unreasonable delay.[10] *United States v. Sharpe,* 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985) (no bright line limit on length of detention in a *Terry* stop).

In *United States v. Horn,* 970 F.2d 728, 732 (10th Cir.1992) the court said:

> When defendant presented the trooper with the unnotarized bill of sale, handwritten on the back of an envelope, and title to the car in another individual's name, the trooper had a "reasonable and articulable suspicion,"

See discussion *United States v. Soto,* supra p. 1555.

In *United States v. Miller,* 84 F.3d 1244 (10th Cir.1996) the defendant challenged his detention after being stopped for speeding. The driver produced a valid driver's license but could not produce a registration. Id. p. 1248. The officer suspected a stolen vehicle, the court upheld the detention Id. p. 1251 quoting from *United States v. Fernandez,* 18 F.3d 874, 879 (10th Cir.1994) ".... a defendant's lack of a valid registration, license, bill of sale, or some other indicia of proof to lawfully operate and possess the vehicle in question [gives] rise to objectively reasonable suspicion the vehicle may be stolen." Further, deference must be given to the officer's ability to determine "between innocent and suspicious actions." *McRae,* supra, p. 1534. The standard is one of reasonableness based on objective facts. *United States v. King,* 990 F.2d 1552 (10th Cir.1993); *Ohio v. Robinette,* supra. In this case the circumstances do not support the defendants' contention that they showed a valid basis to operate the vehicle. Their right to possession was very questionable and there was reasonable suspicion the vehicle was stolen and to continue the detention. Therefore, the detention of defendants was proper. *Miller,* supra; *United States v. Betancur,* 24 F.3d 73 (10th Cir.1994); *United States v. Christian,* 43 F.3d 527 (10th Cir.1994); *United States v. McRae,* supra. The defendants' detention was directly related to the basis of the officer's suspicions. *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325–26, 75 L.Ed.2d 229 (1983). The detention was lawful *United States v. Alvarez,* supra.

*Consent to Search*

Defendants have challenged the consent to search given to Officer Swain by each defendant. Hernandez testified that he did give permission to the officer to search the vehicle. In response to the officer's question he answered "yes." His subjective

---

**9.** Asking about travel plans and destination was reasonable. The destination of a traveler and explanation may not be sufficient in itself to create reasonable suspicion for a detention, but as a factor when added with others may support reasonable suspicion. *United States v. Sanchez-Valderuten,* 11 F.3d 985, 989 (10th Cir.1993); *United States v. McRae,* supra, 81 F.3d at 1535.

**10.** The computer information became available after the vehicle search.

motivation and self serving explanation that the officer would search anyway does not defeat the permission. See *United States v. Zapata*, 997 F.2d 751 (10th Cir.1993). The standard is one of voluntariness from the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Ohio v. Robinette*, supra. *United States v. Mendoza–Salgado*, 964 F.2d 993 (10th Cir.1992). The defendant Villagomez was asked if the whole vehicle could be searched and he replied yes. No objection was ever voiced to the request and the officer did not limit his request to search to any particular place or item. There was no hesitation on the part of either defendant. Although, the defendants' primary language is Spanish, they have a command of English, especially Hernandez, and each understood the request. *United States v. Iribe*, 11 F.3d 1553 (10th Cir.1993); *United States v. Sanchez–Valderuten*, supra; *United States v. Corral*, 899 F.2d 991 (10th Cir.1990). The question of consent must be determined from the standard set out in *United States v. Price*, 925 F.2d 1268 (10th Cir.1991) and *United States v. Butler*, 966 F.2d 559 (10th Cir.1992).

> To admit evidence obtained from a search, wherein consent was given, the following must be found: (1) There must be a clear and positive testimony that consent was unequivocal and specific and freely given; and (2) The government must prove consent was given without duress or coercion, express or implied.

966 F.2d at p. 562.

There is no requirement an officer have reasonable suspicion of contraband to request to search. *United States v. White*, 81 F.3d 775 (8th Cir.1996).

Recently, in *United States v. Hernandez*, 93 F.3d 1493 (10th Cir.1996) the court held a consent to search given while under detention following a traffic stop was voluntary where there was no coercion or duress. See *United States v. Angulo–Fernandez*, 53 F.3d 1177, 1180 (10th Cir.1995). Although defendant was free to go, the officer continued to ask questions leading to the request to search. See also *Ohio v. Robinette*, supra; *United States v. McRae*, supra, (consent to search voluntary where defendant lawfully detained); *United States v. Soto*, supra. p. 1557. The consent to search in this case was voluntary. *United States v. Orrego–Fernandez*, 78 F.3d 1497 (10th Cir.1996).

## Scope of the Search

Defendants contend that Officer Swain exceeded the scope of the permission. In *United States v. Soto*, supra, p. 1558, the court found the "scope of a search is generally defined by its expressed object." *Florida v. Jimeno*, 500 U.S. 248, 251, 111 S.Ct. 1801, 1804, 114 L.Ed.2d 297 (1991). In *Jimeno*, the court said:

> It is very likely unreasonable to think that a suspect, by consenting to the search of his trunk, has agreed to the breaking open of a locked briefcase within the trunk, but it is otherwise with respect to a closed paper bag.

Id. pp. 251–52, 111 S.Ct. p. 1804.

See also *United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). In *Jimeno*, the court said:

> In this case, the terms of the search's authorization were simple. Respondent granted Officer Trujillo permission to search his car, and did not place any explicit limitation on the scope of the search. Trujillo had informed respondent that he believed respondent was carrying narcotics, and that he would be looking for narcotics in the car. We think that it was objectively reasonable for the police to conclude that the general consent to search respondent's car included consent to search containers within that car which might bear drugs. A reasonable person may be expected to know that narcotics are generally carried in some form of a container. "Contraband goods rarely are strewn across the trunk or floor of a car." Id., at 820, 102 S.Ct., at 2170. The authorization to search in this case, therefore, extended beyond the surfaces of the car's interior to the paper bag lying on the car's floor.

500 U.S. p. 251, 111 S.Ct. p. 1804.

Recently, in *United States v. McRae*, supra, the court speaking of the scope of a consent search said:

Mr. McRae argues the search of the trunk exceeded the scope of any consent that was given. Although the district court made no findings on the scope of the consent to search, Mr. McRae asserts that the facts are undisputed. Mr. McRae concedes that he acquiesced in a search of the car and in a search of the trunk. His argument is that the consent to search the trunk did not extend to pulling up the carpet in the trunk and "otherwise dismantling areas of the trunk." Appellant's Br. at 31.

"It is clear that the scope of a consent search is limited by the breadth of the consent given." *United States v. Pena*, 920 F.2d 1509, 1514 (10th Cir.1990), cert. denied, 501 U.S. 1207, 111 S.Ct. 2802, 115 L.Ed.2d 975 (1991)). We employ an " 'objective' reasonableness" standard in evaluating the scope of a suspect's consent: "what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *United States v. Wacker*, 72 F.3d 1453, 1470 (10th Cir.1995) (quoting *Florida v. Jimeno*, 500 U.S. 248, 251, 111 S.Ct. 1801, 1803–04, 114 L.Ed.2d 297 (1991). We determine from the totality of the circumstances "[w]hether a search remains within the boundaries of the consent" given.

81 F.3d at p. 1537.

In *United States v. Rivera*, 867 F.2d 1261, 1265–66 (10th Cir.1989) the court held that verbal consent to search after a lawful stop did not constitute consent to dismantling the vehicle at a nearby service station.

■ In *United States v. Santurio*, 29 F.3d 550, 553 (10th Cir.1994) the court upheld a search of the interior of a vehicle on the basis of consent where the officer moved a few screws and strips of carpeting. The court stressed the officer did not "tear up" the van and a drug detection dog had alerted. In *United States v. Nicholson*, 17 F.3d 1294 (10th Cir.1994) the court held permission to search the entire truck included the undercarriage. See also *United States v. Pena*, 920 F.2d 1509 (10th Cir.1990) (permission to

look in vehicle included looking into quarter panel where there were missing screws); *United States v. Orrego–Fernandez*, 78 F.3d 1497 (10th Cir.1996) (general consent to search vehicle included camper shell area); *United States v. Torres*, 804 F.Supp. 1432 (D.Utah 1992) aff'd other grounds 5 F.3d 548 (10th Cir.1993) (consent to search includes trunk). Therefore, the consent given in this case included in its scope the trunk and the box in which the taped package was found. *United States v. Cannon*, 29 F.3d 472 (9th Cir.1994) (opening trunk approved on basis of general consent and lack of objection).

■ The second question is, did the consent to search authorize the action of Officer Swain cutting into the duct tape wrapped package found in the box in the vehicle trunk? Consent was not specific as to that item. Consent was general to the vehicle and unlimited. This issue is also governed by *Jimeno*, supra. It is the Government's contention under *Jimeno* that the consent included authority to open the package (File Entry # 26). Although Officer Swain asked about the package contents, he did not ask to open the package. The package was securely wrapped with duct tape. The officer had never told defendants what he was looking for nor was the permission to search based on a specific item. In *Jimeno*, supra, the court said the standard for determining whether the search was based on consent is one of an objective reasonableness. 500 U.S. p. 251, 111 S.Ct. pp. 1803–04. The court framed the question as to whether it was reasonable for an officer to think that a general consent to search the car included consent to "examine a paper bag lying on the floor of the car. We think it is." Id. The officer had indicated he was going to search for narcotics. Id. The court said the general consent could assume to encompass "containers within the car that might bear drugs." Id. The court distinguished a Florida case where a suppression order had been affirmed by the Florida Supreme Court which had concluded consent did not include "authorization to pry open a locked briefcase found inside the trunk." (Referencing *State v. Wells*, 539 So.2d 464 (Fla.1989)). The court as noted before said:

It is very likely unreasonable to think that a suspect, by consenting to the search of his trunk, has agreed to the breaking open of a locked briefcase within the trunk, but it is otherwise with respect to a closed paper bag.

500 U.S. pp. 251–52, 111 S.Ct. pp. 1804.

The court said if the consent could be reasonably held to extend to a particular container, the Fourth Amendment "provides no grounds for requiring a more explicit authorization." It should be noted that in this case the officer did not indicate he was looking for drugs and he did cut into a sealed package. This also is not a case where the consent expressly covered containers. See *United States v. Torres*, 32 F.3d 225 (7th Cir.1994).

In *United States v. Lewis*, 24 F.3d 79 (10th Cir.1994) general consent was given to search a vehicle and the officer looked in luggage. The opinion does not indicate whether the luggage was locked. The court stressed *no objection was made*. The court did not analyze the circumstances under the objective reasonableness test of *Jimeno* and did not refer to that case. The search was upheld as consensual.

In *United States v. Langston*, 970 F.2d 692 (10th Cir.1992) the officer, pursuant to consent, looked into a plastic bag the suspect said contained dirty clothes. Id. p. 697–98. However, the officer asked to look in the bag and the suspect said sure. This case is therefore distinguishable from the instant case.

In *United States v. Zapata*, 18 F.3d 971, 977–78 (1st Cir.1994) the court held that consent to search a vehicle also included implicit authorization to search duffel bags within the trunk. However, one of the bags was "partially unzipped" and defendant denied knowing who owned the bags. Id. p. 974. Further, an officer could see into the bag and spied packaging used for drugs. He dropped the package and it emitted a "puff of white powder." The court said, referring to *Jimeno*, the consent included the right to "search any easily accessible containers within the vehicle." Id. p. 977. The court also found abandonment. *Zapata* is not full authority for the search of the package in this case.

In *United States v. Sanchez*, 32 F.3d 1330, 1332–33 (8th Cir.1994) the court upheld looking into sealed boxes. However, the court did not actually focus on the issue that was raised in *Jimeno*.[11] In *United States v. Crain*, 33 F.3d 480 (5th Cir.1994) the court held that general consent to search encompassed a closed paper bag under a seat, but the circumstance was the same as in *Jimeno*, supra. In *United States v. Hernandez*, 893 F.Supp. 952 (D.Kan.1995) consent was given to search a U–Haul truck and the officer opened one of the packing boxes and found marijuana.[12] The court found that under the Tenth Circuit decisions of *United States v. Nicholson*, supra; *United States v. Santurio*, supra, and *United States v. Espinosa*, 782 F.2d 888, 892 (10th Cir.1986) the fact that defendant had not objected constituted consent. 893 F.Supp. at p. 961.

In *Florida v. Jimeno*, supra, Justice Marshall in his dissent argued that the defendant still had an expectation of privacy in the container, a position rejected by the majority. However, he chided the court for apparently abandoning its position in *United States v. Ross*, 456 U.S. 798, 822, 102 S.Ct. 2157, 2171, 72 L.Ed.2d 572 (1982) that the worthiness of the container made no difference to the right to search a container. 500 U.S. p. 253–54, 111 S.Ct. p. 1805–06. Thus, *Jimeno*, is different than *Ross* and the nature of the container is relevant to the scope of consent.

No case has been found that would support a claim that the general consent to search given by the defendants in this case, would encompass an opening of a taped closed package by cutting it. That circumstance seems to fit within the *Jimeno* example of a locked briefcase. The contents were not discernable from outside the package, the pack-

---

**11.** The court did cite to *Jimeno* but only for the proposition that reasonableness is the touchstone of the Fourth Amendment. 32 F.3d p. 1335.

**12.** The court noted the defendant had a poor command of English but the court found defendant understood and the consent was valid. Id. p. 961.

age was not easily accessible. The package was firmly sealed and had to be cut. Therefore, under *Jimeno* the general consent to the search of the vehicle, given in this case, would not encompass cutting the package.

■ However, when Officer Swain found the package in the bottom of the open box, he asked defendant Hernandez three times what was in the package (Tr. p. 26). The officer got an improbable answer. The officer then, in Mr. Hernandez presence, took a knife that was in the open container box and cut open the package. The defendant Hernandez nor Villagomez objected (Tr. pp. 70–71).

In *United States v. Espinosa,* supra, the court in the context of an alleged consent search, addressed the question of whether defendant made a voluntary consent to the search of his automobile. The court in upholding the consent basis for the search observed, "Defendant stood by and watched as Agent Teuber searched the automobile and at no time objected." 782 F.2d p. 892. The court concluded:

Defendant stood by and watched as Agent Teuber searched the automobile and at no time objected. We hold the district court's finding that defendant voluntarily consented to the search is not clearly erroneous. Defendant's final contention is that the search exceeded the scope of the consent. Defendant urges that Agent Teuber's request for permission to "look through" defendant's automobile was so vague that defendant may not have understood the extent of the search. Whether the search remained within the boundaries of the consent is a question of fact to be determined from the totality of all the circumstances. *United States v. Sierra–Hernandez,* 581 F.2d 760 (9th Cir.) cert. denied, 439 U.S. 936, 99 S.Ct. 333, 58 L.Ed.2d 333 (1978). We will uphold the trial court's determination unless it is clearly erroneous. Here, both Arguello and defendant stood by and watched as the search was conducted. The search began with the trunk. Agent Teuber looked underneath the rug in the trunk and throughout the trunk padding. He asked for and received permission to look through the few pieces of luggage in the trunk. He then examined the automobile's interior and spotted a screwdriver lying on the floorboard. He looked in the glove box, under the dashboard, the heater area, and under the front seats. He also looked under the front seat rug. He then examined the back seat rug and the back seat itself. Upon removal of the back seat, Agent Teuber spotted two screws missing from the car's left rear quarter panel. Other screws were loose and had tool marks on them. The panel was loose on one corner. Agent Teuber lifted up the loose corner and spotted the cocaine. Defendant stood beside his car expressing no concern during this thorough and systematic search. The search lasted approximately fourteen minutes. At no time did defendant attempt to retract or narrow his consent. Failure to object to the continuation of the search under these circumstances may be considered an indication that the search was within the scope of the consent.

Id.

In *United States v. Nicholson,* supra, 17 F.3d at p. 1298 the court, focusing on a consent to search, noted the consent "was never revoked." In *United States v. Santurio,* supra, referring to the above cases stated that "this court has specifically ruled that a failure to object to the continuation of a search indicates that the search was conducted within the scope of the consent given." 29 F.3d at p. 553. In *United States v. McRae,* supra, 81 F.3d 1528, 1538 the court also said a failure to object to the continuation of the search may be considered an indication that the search "was within the scope of consent." See also *United States v. Wacker,* 72 F.3d 1453, 1470 (10th Cir.1995) (same); *United States v. Dewitt,* 946 F.2d 1497, 1500–01 (10th Cir.1991) (same); *United States v. Pena,* 920 F.2d 1509, 1514 (10th Cir.1990) (same); *United States v. Lewis,* supra.

■ Consent to search may be implied from the circumstances of the search. *United States v. Zapata,* 18 F.3d 971, 977 (1st Cir.1994) (Defendant provided officers with vehicle keys); *United States v. Varona–Algos,* 819 F.2d 81, 83 (5th Cir.1987) (no objec-

tion to continued looking in bag); *United States v. Flores*, 48 F.3d 467, 469 (10th Cir. 1995) (reopening of trunk). In this case the original consent had been open ended. Although the original consent may not have included the sealed package, where the officer called the package to Hernandez' attention, asked three times what was in the bag, then took a knife from the same box and proceeded to cut the package, and neither defendant voiced any objection, the failure to object must be considered implied consent to the continued search of the package.

Since when the package was opened, probable cause to believe illegal substances were possessed was readily apparent and in plain view, *Horton v. California*, 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990); *Texas v. Brown*, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983), there was a lawful basis for defendants' arrest.[13]

### Confessions of the Defendants

The defendant Hernandez' motion to suppress did not challenge the statements taken from him by Officers Swain or Excell (File Entry # 21). The supplemental post hearing memorandum of Hernandez also does not raise the issue of the admissibility of Hernandez' statements. The statements were proceeded by proper *Miranda* warnings and waivers and are admissible.

▇▇ The defendant Villagomez' motion did broadly challenge the interrogation of him (File Entry # 17) and he renewed his suppression motion in his supplemental memorandum in which it is contended that Villagomez did not understand the *Miranda* warning that was given to him (File Entry # 27).

Villagomez was given a *Miranda* warning by Officer Swain following Villagomez' arrest. Officer Swain did not pursue the interrogation of Villagomez because Villagomez said he did not understand his rights. No statement was obtained.

Subsequently, Swain contacted UDI Sergeant Excell who interrogated Villagomez at the Beaver County Sheriff's office. Before the interrogation, Excell was particularly careful and persistent in giving and explaining to Villagomez the *Miranda* warning. In spite of some language problems, Villagomez was fully advised of his rights and understood them. Thereafter, he voluntarily agreed to speak to the officer. At the hearing on the motion to suppress Villagomez admitted to being able to understand some English (Tr. p. 91). His testimony fully supports the conclusion that he understood Officer Swain's directions and requests. The testimony at the suppression hearing was that Villagomez told Excell that Villagomez did not understand his rights. Sergeant Excell's testimony to the contrary when coupled with Villagomez's other testimony and demeanor during the court proceedings, shows he understood matters addressed to him and supports the finding that Villagomez understood the preinterrogation warning and elected to speak. C.f. *United States v. Pena*, 920 F.2d 1509, 1512–1513 (10th Cir.1990).[14] The prosecution has carried its burden by a preponderance of the evidence on this issue and there is no basis for suppression.

### Conclusion

The motions to suppress of Fortino Garcia Hernandez and Luis Angel Villagomez should be denied.

Copies of the foregoing Report and Recommendation are being mailed to the parties who are hereby notified of their right to object to the same. The parties are further notified that they must file any objections to the Report and Recommendation within ten (10) days after receiving it. Failure to file

---

**13.** Because of the determination that the search and finding of the drugs was based on consent, the court need not consider the question of whether there was probable cause to otherwise search the package under *United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982); *California v. Acevedo*, 500 U.S. 565, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991).

**14.** The findings in this instance that Villagomez understood his rights by the patient and persistent explanation by Officer Excell does not mean it would not have been better practice to have called a Spanish speaking officer or interpreter to aid in the interview. However, it is not a basis for suppression that the officer did not pursue the best course.

objections may constitute a waiver of those objections on subsequent appellate review.